660 So.2d 743 (1995)
OKEELANTA CORPORATION, Osceola Farms Company, and Atlantic Sugar Association, Inc., Appellants/Cross-Appellees,
v.
Bernard BYGRAVE, et al., Appellees/Cross-Appellants.
UNITED STATES SUGAR CORPORATION, Appellant/Cross-Appellee,
v.
Bernard BYGRAVE, et al., Appellees/Cross-Appellants.
SUGAR CANE GROWERS COOPERATIVE OF FLORIDA, Appellant/Cross-Appellee,
v.
Bernard BYGRAVE, et al., Appellees/Cross-Appellants.
Nos. 92-2773, 92-2792 and 92-2807.
District Court of Appeal of Florida, Fourth District.
August 2, 1995.
*744 William P. Killian and Joseph P. Klock, Jr. of Steel Hector & Davis, Miami, and Bruce Rogow of Bruce S. Rogow, P.A., Fort Lauderdale, for appellants/cross-appellees Okeelanta Corporation, Osceola Farms Company, and Atlantic Sugar Association, Inc.
Jane Kreusler-Walsh of Jane Kreusler-Walsh, P.A., West Palm Beach, and Robert Muraro of Thomson Muraro Razook & Hart, P.A., Miami, for appellant/cross-appellee United States Sugar Corporation.
David L. Ross of Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, P.A., Miami, for appellant/cross-appellee Sugarcane Growers Cooperative of Florida.
David L. Gorman of David L. Gorman, P.A., North Palm Beach, James K. Green, West Palm Beach, and Edward J. Tuddenham of Wiseman, Durst & Tuddenham, Austin, TX, for appellees/cross-appellants Bernard Bygrave, et al.

ON MOTION FOR REHEARING
WARNER, Judge.
We deny the motion for rehearing except insofar as it points out a factually inaccurate sentence in the statement of facts. We therefore withdraw our previously issued opinion, eliminate the sentence, and substitute the following in place of our original opinion.
In granting the summary judgment challenged in this appeal, the trial court determined that a contract between the sugar companies sued herein and cane cutters employed by those companies was clear and unambiguous in setting a minimum rate of pay per ton cut. Appellants point out that nowhere in the contract was such a provision explicitly stated and challenge the construction of the contract advocated by appellees and accepted by the trial court. We agree that the contract is not clear and unambiguous, but we cannot accept appellants' construction of the contract as the only possible construction of all of its terms. We therefore reverse and remand.

I. FACTS
The appellees are sugar cane cutters who work in the cane fields of south Florida cutting sugar cane for the appellant companies. *745 Most, if not all, of the cane workers are foreigners, mainly from Jamaica and other Caribbean Islands. During the years in question in this suit the appellant companies employed approximately 10,000 such foreign workers. They all entered the United States on temporary visas after the U.S. Department of Labor (DOL) had certified that an insufficient supply of domestic workers was available to fill the positions.
The process of obtaining the certification of the DOL and obtaining the foreign workers is controlled by the Wagner-Peyser Act of 1933, 29 U.S.C. § 49, et seq. One of the purposes of the act is to protect domestic workers from foreign workers whom employers might be able to hire for less than prevailing domestic wages. To obtain the necessary certification to import foreign workers, employers must submit "clearance orders" which are in essence job offers describing the terms and conditions of the job for which workers are sought. The clearance order must state the minimum benefits and wages that the employee will receive as well as describe the working conditions. The "orders" are actually printed forms approved by the DOL. These orders are first circulated within the domestic market of employees. Then, when the employer's labor needs are not filled during the domestic recruitment period, the DOL issues a certification for the importation of foreign workers. However, these foreign workers must be employed under the same terms and conditions of work as those offered in the clearance orders. When an employee is hired, an individual work contract, reflecting the terms of the clearance order, is provided to the worker not later than the day work commences.
In the case of sugar cane workers, the employer/appellants all furnished nearly identical clearance orders to the DOL. In them, the employer listed wage rates, special pay information and deductions in block 9; anticipated hours of work per week and normal hours per day in block 10; and job specifications in block 11. In block 9, representative clearance orders read as follows:
9. Wage Rates, Special Pay Information and Deductions:
Crop Activity: Sugar Cane
Flat Rate: $5.30 per hour [This rate varied from year to year in the clearance orders.]
Piece Rate: XXX [Other clearance orders specified "n/a Task Rate" or "Varies based on length of row, tonnage and other factors."]
Unit: XXX [or n/a]
Est. Hourly Rate Equiv. [This was blank or the same as the Flat Rate.]
In an attachment to Block 9 of the clearance order, the following additional information was included on wage rates:
A. All workers hired will be guaranteed the Adverse Effect Wage Rate[1] or the prevailing rate whichever is higher.
... [t]he worker will be paid on a task basis and will be required to cut fast enough so that his average task-rate earnings will be at least equal the [sic] minimum wage rate.
Workers will be advised orally of the price they will be paid for cutting each assigned row or portion of row. These prices will enable the average cane cutter to earn more than the minimum wage rate.
The work of slower cutters will be measured during three different trial work days subsequent to the eight-day training period to determine whether the worker is cutting fast enough to comply with the minimum production standard required of all workers. On each of the three (3) trial days the worker is measured, the worker will be sent home if he does not meet the required minimum production standard. Upon failure to meet the minimum required production standard on the third trial day, the worker may be terminated.
* * * * * *
B. Harvest cane cutters will be paid for each "cut row" based on a task work rate. Workers are advised of the task at the start of each new task. The task rate is generally based on numbers of tons of cane *746 cut by an average cane cutter, variety of cane, type of soil, etc. The worker will be paid his task work earnings OR the minimum rate per hour times the number of hours worked, whichever is greater for each bi-weekly pay period. A worker would be expected to cut an average of eight (8) tons of harvest cane per day throughout the season.
* * * * * *
E. Attached is a worker handout entitled "Sugar Cane Training Period and Task System" which should be given to every applicant referred against this Job Order.
* * * * * *
The attached worker handout included the following:
The task set for each day in terms of the number of feet of cut cane the worker is expected to cut in one hour, is based on the experience of the company over many years. The same procedure for setting a task will be used as has been used in the past. Over 95% of the cutters have made the task in the past and it is considered a reasonable task and work standard by the company.
* * * * * *
In block 10, the clearance orders provided as follows:

 10. Anticipated Hours of Work Per Week 48
 Normal Hours Per Day (Monday through Saturday) 8

In an attachment to block 10, the following additional information was provided:
The employer will guarantee the opportunity for work for the hourly equivalent of 3/4 of the work days of the contract period or any amendments thereto. For purposes of the work contract, a "work day" consists of eight (8) hours of any day, EXCEPT Federal holidays and the Worker's Sabbath.
When the workers were hired, each worker received and executed an individual contract. Copies of the master forms of such agreements were presented to the trial court. Provisions in the contract included the scope and period of employment, the obligations of the worker, the payment of wages, and the grounds for termination. Some of the agreements had blanks which included Article V 3(d), "Productivity standard and/or other conditions." The addendum explaining this provision stated only that "the worker will be paid on a task basis and will be required to cut fast enough so that his average earnings will at least equal the" AEWR. With respect to Termination for Cause, the agreements provided that "The worker may be immediately terminated for cause by the Employer if: (a) The worker is unable or unwilling to produce sufficient work to meet the minimum production standards stated in Article V 3(d) or the standards generally applicable to the agricultural crop in the area of employment after he has been afforded whatever reasonable trial and/or training period prescribed in the aforesaid crop and area of employment" (emphasis supplied). Other agreements in the record also refer to "the minimum production standards generally applicable to the agricultural crop in the area of employment."
In the underlying action, the appellee workers sued the appellant companies in 1989 for breach of contract, claiming that since 1983 the companies had been paying wages less than those set forth in their contracts of employment, specifically identifying the terms of the clearance orders. The suit was certified as a class action covering the period from 1983 to 1991. Throughout the proceedings the workers have contended that the clearance orders set a minimum task rate of the AEWR (generally $5.30) for each ton of cane cut. The damages claimed were the difference between the compensation received and the task rate per ton which the workers alleged was due.
The companies defended, disputing the wage formula of a minimum task rate per ton. They also raised the defenses of the statute of limitations, estoppel, and good faith reliance on the ratification of the DOL of their methodology of calculating the wages paid. After voluminous discovery, appellants and appellees filed cross motions for summary judgment.
The trial court found that both the clearance orders and the worker contracts required *747 a minimum productivity standard. It determined that since the clearance orders provided that the worker was expected to cut an average of eight tons of harvest cane per day throughout the season, that was the productivity standard. Moreover, because a worker on the task rate "will be required to cut fast enough so that his average task-rate earnings will be at least equal" to the AEWR, the eight tons per day productivity standard translated to a task rate of $5.30 per ton based on an eight hour day. In other words, since the workers were required to average cutting one ton per hour, and the pay rate required at least the AEWR of $5.30 per hour, cutting one ton should bring a minimum payment of $5.30. Relying on the rationale of Frederick County Fruit Growers Ass'n, Inc. v. McLaughlin, 703 F. Supp. 1021 (D.D.C. 1989),[2] the trial court held,
given the purpose of the Wagner-Peyser Act, and the terms of the relevant clearance orders, that the minimum productivity rate required of a worker to keep his job and maintain the AEWR per hour, requires the payment of a minimum task rate of not less than the minimum hourly rate (AEWR) for each ton cut. The terms of the contract unambiguously require an average production of eight tons per eight hour day.
... [T]he method of pay for cutting harvest cane on the task system is an incentive system intended to reward workers for cutting faster than the required minimum rate. Thus, workers cutting faster than the minimum task rate (of not less than the AEWR per ton) must operate to pay the worker cutting faster, or cutting in a more difficult field situation, at a rate higher than the minimum defined in the written clearance order which forms part of the employment contract as a matter of law.
Having determined that the contract was clear and unambiguous in this regard, the court granted summary judgment in favor of the workers. A later order of the trial court determined that appellants' defenses failed as a matter of law, although the court did determine that the workers' claims for wages prior to August 25, 1987, were barred by the statute of limitations.[3] It is from these orders that appellants appeal and appellees cross appeal.

II. IS THE CONTRACT CLEAR AND UNAMBIGUOUS?
The central issue in this case is whether the clearance order clearly and unambiguously established a task rate of $5.30 per ton of cut cane. If it did not, then the trial court must be reversed, for the trial court's judgment is entirely based on the finding that the contract is clear and unambiguous.
It is a cardinal rule that the construction of all written instruments is a question of law and belongs to the courts, provided "the language used is clear, plain, certain, undisputed, unambiguous, unequivocal, and not subject to conflicting inferences." Friedman v. Virginia Metal Products Co., 56 So.2d 515, 516 (Fla. 1952). Citing to Friedman when presented with two conflicting interpretations of a brokerage contract, Judge Owen of this court noted in Royal Am. Realty, Inc. v. Bank of Palm Beach and Trust Co., 215 So.2d 336, 338 (Fla. 4th DCA 1968):
Rhetorically we pose the question of whether the language of this agreement is clear and unambiguous? Interestingly enough, all parties adamantly maintain that it is. Furthermore, all parties insist that the written brokerage agreement is susceptible of only one reasonable interpretation. Understandably, the "only reasonable interpretation" as seen by appellant is materially different from the "only reasonable interpretation" advocated by appellees. Each view is persuasive and while we have heretofore indicated that which we feel is the better view, neither *748 interpretation sought for the language of the written agreement can be said to be unreasonable. It is a paradox, therefore, that the language which all parties assert (and the court found) to be unambiguous can be rendered ambiguous in fact by the different reasonable constructions advocated for it, since it has been held that a contract is ambiguous when it is reasonably or fairly susceptible to different constructions.
We find ourselves with the same rhetorical question in this case. Each side adamantly has maintained that its interpretation of the contract is clear and unambiguous, although the employers' secondary position has been that at least the workers' interpretation is not clear and unambiguous and consequently summary judgment should not have been entered.
The trial court's ruling creates parity between the task rate and the hourly rate based on an assumption that the minimum productivity required of the worker was one ton per hour. Nowhere in the clearance order or the worker contracts is the task rate set forth in terms of a measured unit of cane equalling a dollar amount of pay. Instead, this requirement must be pieced together from various parts of the clearance order in a way which the workers contended, and the trial court found, would harmonize all of the terms of the contract. However, in doing so, some of those terms are imbued with meanings not in conformity with the contract language, while other contract provisions are ignored.
The workers' argument assumes that the clearance orders and contracts require that the worker cut a minimum of eight tons in a day or one ton per hour and that a work day comprises eight hours. Thus, since the worker must be guaranteed a minimum of the AEWR per hour, the dollar value assigned to the cutting of each ton must under this calculation also equal the AEWR. However, block 10 of the clearance order provides for "normal hours" of daily work. It does not specify that each worker will at all times work exactly eight hours a day. Additionally, block 9 provides that a worker would be expected to cut an average of eight tons each day. It does not state that the worker shall cut a minimum of eight tons per day. The language is that of expectation rather than a definite production minimum. See Roy Jorgensen Associates, Inc. v. Deschenes, 409 So.2d 1188 (Fla. 4th DCA 1982). It is only by recasting these terms of the contract from what is "normal" or "average" to what is the "exact" amount or "minimum" required that the workers' formulation, and the trial court's conclusion, can be accepted as a matter of law. Since these terms are not cast as exact or minimum requirements in the clearance orders or contracts themselves, we cannot conclude that the terms clearly and unambiguously provide what the workers and the trial court say they do. Moreover, the workers' interpretation conflicts with the provision in Block 9 which sets forth that "the worker will be paid his task work earnings OR the minimum rate per hour times the number of hours worked, whichever is greater for each bi-weekly pay period."
The employers offer as an alternative interpretation of this language that its purpose is to inform the worker of the criteria involved in setting the task rate, one of which is how much the average cutter can cut per day. This gives the worker an idea of how hard of a job it will be to perform the task assigned and earn the task wages for the day. Thus the workers' interpretation is not the "only reasonable interpretation" of the language.
Nor is the workers' interpretation consistent with all the terms of the contract. Adopting their position, if workers on average cut eight tons per eight hour day, and each ton is worth the AEWR for cutting, then the average worker would not earn more than the AEWR rate over the season. That would be contrary to the provision in the clearance order that the task rate "prices will enable the average cane cutter to earn more than the minimum wage rate."
Thus, in order to give effect to all of the contract terms under the workers' interpretation, the AEWR must be the minimum amount paid per ton. Because of the difficulty in cutting some cane, some tonnage would be priced more, but none would be priced less. As the clearance order provides that *749 all material terms of the contract are included, we would expect the contract to include not only the minimum amount paid per ton but also how to calculate the increased amount each ton is worth to cut depending on the difficulty of harvesting it. No one has suggested that the clearance order provides any way of calculating those figures, and deposition testimony reveals that the calculation of the task rate is based on years of experience of the employer. This is consistent with the attachment to the clearance order which explains the task rate system:
The task set for each day in terms of the number of feet of cut cane the worker is expected to cut in one hour, is based on the experience of the company over many years. The same procedure for setting a task will be used as has been used in the past.
Thus, even accepting the workers' interpretation of compensation under the contract, there would be material terms missing, which they never try to explain.
While the workers state that their interpretation harmonizes all of the terms of the contract, it does so only by changing their meanings and ignoring some provisions. Thus, we hold that the trial court erred in finding that the contract was clear and unambiguous, warranting judgment in favor of the workers.
We acknowledge that if the contract has no correlation between the AEWR and production, then the appellant companies could require the workers to produce more each year as the AEWR increased, which is contrary to DOL regulations. See Frederick County Fruit Growers Ass'n, Inc. v. McLaughlin, 703 F. Supp. 1021 (D.D.C. 1989), aff'd, 968 F.2d 1265 (D.C. Cir.1992). The employers adamantly maintain that that has not happened.
We are aware that in NAACP, Jefferson County Branch v. U.S. Secretary of Labor, 865 F. Supp. 903 (D.D.C. 1994), Federal District Judge Charles Richey rejected the DOL's contention that the eight ton per day expectation was not a productivity standard. The issues in that case revolved around whether or not the clearance orders complied with federal regulations. No question of compliance with federal regulations is involved in this case. The workers claim only that the employers breached the terms of the clearance orders by not paying them enough, not that the terms of the contracts do not comply with federal law. However, Judge Richey's opinion gives further support to the reversal of the summary judgment in this case. Although he rejected the DOL's contention that the eight ton per day language did not amount to a productivity standard at all, he remanded the case for further evidence on the issue of whether it constituted the minimum productivity standard. Moreover, Judge Richey also found that there was a significant dispute as to how many hours constituted an actual day. These two findings are critical to the contract formulation of the workers in this case.
Having themselves moved for summary judgment, the employers argue that the contract should be construed as a matter of law in accordance with their interpretation and that they are entitled to summary judgment in their favor. We reject this contention for the same reason that we reverse the trial court's summary final judgment in favor of the workers, namely that the contract is susceptible to differing reasonable interpretations. Moreover, we do not find that the extrinsic evidence is susceptible to only one interpretation. While the employers offered the affidavit of a former DOL official which stated that the eight tons was not a production standard, the clearance orders themselves refer to a "minimum production standard", and the individual contracts between the employers and the workers refer to "minimum production standards" such as those "generally applicable to the agricultural crop in the area of employment." What that standard may be is not otherwise spelled out in the worker contracts. That is important for defining the task rate. How the task rate is calculated is the key to the appellees' contract argument, and the former DOL official's affidavit does not address it.
Under appellants' interpretation of the contract, nowhere in the contract or the clearance orders is minimum productivity defined, but a worker could be fired if the worker fell below the minimum production *750 standard. Appellees counter that when an incentive based pay system includes a productivity standard, the rate of pay, the production standard, and the minimum hourly earnings level are mathematically related to one another. They claim that under appellants' reading the employer may set the task rate as low as it wants and, correspondingly, require workers to cut as fast as it wants in order to earn the AEWR per hour and retain their jobs. The parties differ also on the number of hours worked, the employers offering statistics showing an average of about six hours a day and the workers disputing this number. Moreover, there is evidence in the record that the employers actually prepare their budgets based on a price per ton to cut the cane. Thus, there are disputed issues of fact which bear upon the interpretation of this ambiguous contract.

III. AFFIRMATIVE DEFENSES

(a) Good Faith Reliance
The companies charge that the trial court erred in striking their affirmative defense that they relied in good faith on the DOL approval of the clearance orders. We agree with the trial court that such reliance is not a legal defense to this state law breach of contract action, and the federal cases cited by appellants in support of their position all deal with non-contract cases where workers alleged violations of federal law. See Morrison v. U.S. Dept. of Labor, 713 F. Supp. 664 (S.D.N.Y. 1989); Donaldson v. U.S. Dept. of Labor, 930 F.2d 339 (4th Cir.1991). That is not to say that the evidence of DOL approval and the contact between DOL and the companies in reviewing the clearance orders may not be relevant to the interpretation of the contract. Our affirmance of the insufficiency of the legal defense to this contract action should not be read as an evidentiary bar to these matters.

(b) Statute of Limitations

(i)
Okeelanta and Osceola have appealed the trial court's order imposing class action damages for unpaid wages accrued prior to July 1989, contending that claims for those wages are barred by the statute of limitations. We affirm the trial court's determination.
Of the original workers filing suit in August 1989 against the sugar companies, only two had been employed during the relevant time periods with Okeelanta and Osceola. After much discovery and requests for class certification, the trial court ruled on August 20, 1990, that none of the workers which it found were capable of being class representatives had claims against Okeelanta or Osceola. Therefore, the court ruled that the case would proceed only as to the individual claims of the two workers as to Okeelanta and Osceola.
Some six and nine months later, two motions to intervene were filed by Gordon and McKellar alleging that they had been employed with Okeelanta and Osceola from the early 1980s to 1990. These parties were added as plaintiffs on July 19, 1991. Nearly a year later, over the strenuous objection of the appellant companies, the trial court certified the action as a class action with these new plaintiffs as class representatives.
Okeelanta and Osceola contend that the class claims for unpaid wages prior to July 1989 were barred by the two year statute of limitations, because the new class representatives became parties only in July 1991. The workers contend that their joinder related back to the initial filing of the complaint in August 1989, and therefore the statute of limitations did not bar the damages awarded by the trial court from August 1987 to August 1989.
The workers cite Rubenstein v. Burleigh House, Inc., 305 So.2d 311 (Fla. 3d DCA 1974), for the proposition that the addition of new representative parties relates back to the filing of the initial claim. In Rubenstein a condominium association filed suit on behalf of its unit owners alleging breach of warranties by the developer. The court dismissed the complaint on the ground that the condominium association lacked standing to sue in a representative capacity.[4] An individual unit owner then filed an amended *751 complaint on behalf of himself and the rest of the unit owners. The court held that the defendant was not prejudiced by the amendment adding a proper class representative even though it may have been beyond the running of the statute of limitations, because the defendant knew from the filing of the original complaint who the proper parties were and the extent of the claim that was being asserted. The court quoted Justice Holmes in New York Central & H.R.R. Co. v. Kinney, 260 U.S. 340, 43 S.Ct. 122, 67 L.Ed. 294 (1922), who said:
[W]hen a defendant has had notice from the beginning that the plaintiff sets up and is trying to enforce a claim against it because of specified conduct, the reasons for the statute of limitations do not exist, and we are of the opinion that a liberal rule should be applied.
Okeelanta and Osceola argue that relation back is inapplicable because the first class action terminated with the trial court's order denying class certification. However, we hold that an order denying class certification without a dismissal of the entire cause of action is not a final order terminating the cause of action. See Coopers & Lybrand v. Livesay, 437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978). Therefore, being a non-final order, it is subject to trial court correction and amendment of pleadings to cure defects. Here, the original complaint set forth a class claim for unpaid wages, and the trial court determined that the claims were subject to treatment as a class. The court found, however, that the employee-plaintiffs who had worked for Okeelanta and Osceola were so lacking in an understanding of the claims and unable to testify truthfully that they could not be adequate class representatives. Thus the defect in the class representatives was not that those plaintiffs did not have a claim similar to the entire class but that attributes personal to themselves precluded their representation of the class. Consequently, this case is different from Fleck v. Cablevision VII, Inc., 807 F. Supp. 824 (D.D.C. 1992), cited by the companies as directly on point. In that case, the class certification was denied because the original plaintiffs' claims were not typical of the class they claimed to represent, and the district court denied the application of relation back under Federal Rule of Civil Procedure 15, which is more restrictive than our Florida Rule of Civil Procedure 1.190(c). Moreover, the district court did not find that the case would be most appropriately resolved as a class action. Id. at 826-27 n. 4.
Here, appellants knew from the filing of the original complaint that the plaintiffs were asserting a class-wide claim for unpaid wages. The trial court found that the claim was susceptible to class-wide treatment. It merely rejected individual plaintiffs as representatives of the class. We think the liberality of the relation back rule in Florida[5] permits an amendment to a class action lawsuit to substitute alternative class representatives after the trial court's rejection of the initial representative. No new cause of action has been stated, nor different damages requested. We thus affirm the trial court's determination that the statute of limitations did not bar the class action as to Okeelanta and Osceola from August 1987 forward.

(ii)
The workers appeal that part of the summary final judgment granting the employers summary final judgment on the ground that claims for compensation prior to August 25, 1987, were barred by the running of the statute of limitations. We find no error in the determination of the trial court. We affirm the summary judgment in this respect.

IV. CONCLUSION
For the foregoing reasons we reverse the summary final judgment and judgment awarding damages entered by the trial court. There are material issues of disputed fact still remaining to be resolved. However, we affirm the trial court's determination that the good faith reliance on DOL approval was not a legal defense, although evidence of reliance may be used on the issues of contract interpretation. Finally, with respect to the statute of limitations, we affirm the trial court's ruling that the additional class representatives related back to the institution of the *752 suit but that any claims by workers prior to August 25, 1987, were barred by the statute of limitations.
Reversed in part and remanded for further proceedings.
POLEN and PARIENTE, JJ., concur.
NOTES
[1] The Adverse Effect Wage Rate (AEWR) is a federal minimum wage determined by the DOL for agricultural employment on a state-by-state basis. The parties agree that for most of the relevant time period involved in this case that rate was around $5.30 per hour.
[2] That case involved the issue of whether the fruit growers' method of payment complied with federal law. It did not address issues of contract interpretation.
[3] Based upon a stipulation prepared by the parties after summary judgment using the calculations required by the summary judgment, the court entered a judgment for damages of $50,980,226.64.
[4] The suit was brought before the adoption of § 718.111(3), Fla. Stat. and Fla.R.Civ.P. 1.221.
[5] See Palm Beach County v. Savage Const. Corp., 627 So.2d 1332 (Fla. 4th DCA 1993).