MAY, C.J.
The historical saga of the Florida Gas Transmission Company (“FGT”) and the Florida Department of Transportation (“DOT”) provides the factual background for this appeal. DOT appeals a declaratory judgment that set an easement’s width and a damages judgment rendered after a jury verdict that determined who was responsible for the cost of relocating gas pipelines because of a Turnpike expansion project. DOT argues error in the trial court’s submission of unambiguous contract language to the jury for interpretation, the resulting verdict finding FGT entitled to reimbursement for relocation expenses, and in the trial court granting FGT a uniform permanent and temporary space easement width. Numerous sub-issues are raised. On cross-appeal, FGT argues the trial court erred in requiring it to pay the cost of relocating the pipeline if it does not consent to DOT paving over the pipeline in the future, and failing to find that mechanically-stabilized earth walls always interfere with FGT’s easements. We affirm in part and reverse in part.

The History Begins: The 1958 Easement

In 1958, the Florida Turnpike Authority entered into an easement agreement with Houston Gas for the purpose of laying, constructing, maintaining, and operating a natural gas pipeline within the Turnpike right-of-way. Pursuant to the 1958 easement, Houston Gas installed an eighteen-inch pipeline along 109 miles of the Turnpike.
The easement contained a metes and bounds description with a starting and *1098 ending point, but did not specify where within the easement the pipeline would be located. The pipeline and necessary appurtenances were “to be constructed in the most practicable and workable locations, consistent with usual pipeline construction procedures, by and with the consent of [the Turnpike Authority] and its engineers.” The easement specified that the pipeline would be located “at a distance of not less than 40 feet from the outer edge of the pavement of [the Turnpike], except where structures and topographical features shall require a lesser distance, as permitted by [the Turnpike Authority] or its engineers.” The legal description did not specify a uniform easement width or guarantee a minimum amount of tempo.-rary work space.

The History Continues: The 1967 Easement

Houston Gas became known as FGT in 1962. Five years later, the Turnpike Authority entered into a second easement agreement that allowed FGT to lay a second twenty-four-inch pipeline along the Turnpike right-of-way south of Fort Pierce and a nine-mile pipeline in Orange County. The 1967 easement again contained a metes and bounds description with beginning and ending points, but no specific location within the right-of-way for the pipeline. The 1967 easement also contemplated that FGT would lay the pipeline at least forty feet from the outside edge of the pavement, subject to the Turnpike Authority’s ability to grant a variance.
Paragraph four of the 1967 easement stated in part:
The laying and installation of said pipeline, and the construction and operation thereof, shall be in conformity with the industry’s standards for the highest grade of design, construction and operation, for a similar facility paralleling a limited access highway in a populated urban area; provided, however, that in no event shall the standards be below those requirements set forth in the American Standard Code for Pressure Piping, ASA B31.8, with any changes or additions which may be mutually agreed upon in writing by both [DOT] and [FGT],
The 1967 easement required FGT “to conduct its activities in connection with the construction and operation of any and all pipelines which have been, or may be, constructed and operated by [FGT] in such a manner so as to interfere to the least possible extent with the overall operation of the [Turnpike].”
The 1967 easement required FGT to be responsible for its own expenses should a Turnpike expansion require relocation of its pipeline. It also incorporated the terms of the 1958 easement “relative to maintenance, operation, relocation and removal of [the] pipeline.” The parties agreed that sections of the pipeline located under crossings of underpasses, access roads, interchanges, and the Turnpike itself would be bored underground.

The History Continues: The 1987 Amendment

In 1987, the parties agreed to amend the 1967 easement to clarify the rights of the parties with respect to the cost of relocating the gas pipelines. Following the 1987 amendment, section 10 of the 1967 easement read:
In the event it shall become necessary to rearrange or relocate the pipeline system to accommodate changes or improvements on or to the [Turnpike] and such rearrangements and relocations are reasonably required for such purposes, they will be made by [FGT] at its own expense.... In construing this paragraph, it is understood that [DOT] will fully cooperate with [FGT] to the end that such changes and relocation of [FGT’s] pipeline system may be held to *1099 the minimum necessary to accomplish [DOT’s] purposes; and when an alternative method or methods are possible, and in the judgment of [DOT] are substantially equal in cost and feasibility, such alternative method or methods may be adopted and [FGT’s] pipeline system permitted to remain in place or with a minimum of disturbance. [DOT] shall not have any obligation or responsibility to pay or reimburse [FGT] for rearrangements or relocations of [FGT’s] pipeline(s) under this Paragraph 10; provided that such rearrangements or relocations are reasonably required to accommodate changes or improvements to the [Turnpike].... The determination of what changes and improvements are to be made on or to the [Turnpike] is reserved solely to [DOT],

The Plot Thickens: The 1992 Agreements

In 1992, FGT and DOT entered into two agreements, one for use when FGT was located within the state right-of-way, pursuant to a permit or license (the “Non-Reimbursable” Agreement), and another if FGT owned a property interest in DOT’s right-of-way (the “Reimbursable” Agreement). The Reimbursable Agreement provided that “[w]hen the [DOT] has served an order on [FGT] regarding relocation of [FGT’s] facilities along, over and under property in which [FGT] holds a compen-sable interest,” FGT agreed to relocate the necessary facilities. DOT agreed to reimburse [FGT] “for all costs incurred by it in each such relocation of said facilities.”
Paragraph 1 specifically incorporated the terms of the Utility Accommodation Guide (“UAM”), and “any supplements thereto or revisions thereof.”[1] The 2004 UAM, which was admitted into evidence without objection, defines “compensable interest” as “having established real property rights.”

The Saga Begins: The Widening Projects

In 2000, the Turnpike Authority initiated the widening projects. On April 19, 2004, the Turnpike Authority sent the first of four'“Final Agreement Package” letters to FGT, confirming the project would require FGT to adjust and/or relocate its pipeline facilities. These “Final Agreement Packages” included documentation for FGT to submit its relocation costs to DOT. The Turnpike’s Utility Manager testified that the Turnpike Authority’s normal practice was to send these “packages” authorizing reimbursement of utility relocation expenses only after the correspondence had been subject to a full review by DOT’s legal department.[2]
As the expansion plans were modified, the Turnpike Authority sent additional Final Agreement Packages to FGT on July 22, 2004, December 28, 2004, and January 5, 2005. Those letters included paperwork consistent with FGT’s entitlement to seek reimbursement of its relocation costs from DOT. At trial, DOT argued that the packages were sent by mistake. However, the Turnpike Authority’s Director of Planning and Production, who was in charge of overseeing all Turnpike[1] projects and budgets, testified that DOT would be required to provide FGT with a place to relocate because FGT had a “compensable interest.”
Pursuant to the Reimbursable Agreement and the four Final Agreement Package letters, FGT sought reimbursement *1100 for its relocation costs. DOT refused to pay, and FGT filed suit seeking reimbursement of the relocation costs and a determination of a permanent easement width and temporary easement workspace.[3] DOT counterclaimed for breach of the easement agreements by FGT, and sought damages for delays caused by FGT and for having to remove FGT’s old pipelines.
DOT moved for summary judgment on FGT’s demand for reimbursement, arguing the Reimbursable Agreement could not apply as a matter of law because FGT lacked a “compensable interest” in the property and DOT had never “served an order of relocation” triggering the Reimbursable Agreement. FGT argued the term “com-pensable interest” was unambiguous and defined by DOT’s 2004 UAM to mean “having established real property rights,” which FGT had through the easement agreements. The trial court denied DOT’s motion. The trial coui’t also denied both parties’ motions for summary judgment on the easement width issue.
The evidence at trial included factual and expert testimony regarding standards in the industry; federal regulations; and the space needed by FGT to install, operate, repaii’, and maintain its gas pipelines. At the close of FGT’s evidence, DOT moved for a directed verdict on the meaning and application of the Reimbursable Agreement. The trial court denied the motion.
DOT’s proposed Jury Instruction number 32, entitled “Easement Interpretation: Ambiguous,” addressed how the jury should determine the meaning of the easements if the trial court determined they were ambiguous. The instruction did not address the Reimbursable Agreement or suggest that any provision was ambiguous. FGT’s proposed Jury Instruction number 33 provided that any ambiguous term in an easement must be resolved against DOT as the grantor.
During the charge conference, the trial court asked the parties what they contended was ambiguous. FGT responded that the width of the easement was ambiguous. The trial court denied both requested instructions on ambiguity.
DOT agreed to the verdict form even though it did not contain an interrogatory directed to the interpretation of either the Reimbursable Agreement or the easements. The verdict form contained only two relevant interrogatories: (1) whether DOT breached the Reimbursable Agreement; and (2) the amount of damages. The other questions asked whether FGT or DOT had breached the easement agreements. The jury answered all easement questions in the negative. The jury answered yes to whether the DOT had breached the Reimbursable Agreement, and awarded $82,697,567 in damages.
Subsequent to the jury verdict, the trial court determined the two declaratory relief counts. The trial court concluded that FGT was entitled to an easement with a permanent width of fifteen feet on each side of the pipeline, and a width of seventy-five feet of temporary workspace for construction, repair, and removal of its pipelines. In the final judgment, the trial court concluded: (1) the legal description contained in the easements clearly demonstrated the pipelines were intended to be outside of the pavement boundaries; (2) the placement of pavement over FGT’s pipelines is an interference with FGT’s easement rights; (3) DOT is not permitted to pave over the pipelines without FGT’s consent except at those road crossing situations specifically addressed in the *1101 easements; and (4) the Reimbursable Agreement between DOT and FGT is terminated.
DOT moved for judgment notwithstanding the verdict, arguing the trial court should have determined the meaning of “compensable interest” as a matter of law before the case was submitted to the jury and that FGT did not have a compensable interest. DOT continued to argue that the Reimbursable Agreement had not been triggered because DOT had never served an order of relocation on FGT. The trial court denied the motion. DOT appealed the final judgment; FGT filed a cross-appeal.
On appeal, DOT first argues the trial court erred in submitting the interpretation of the Reimbursable Agreement to the jury without determining the meaning of compensable interest as a matter of law. DOT argues that compensable interest means “a legal right claim or title in something that, if taken, results in an entitlement to compensation.” FGT responds that the trial court properly rejected DOT’s definition of compensable interest, properly considered extrinsic evidence, and correctly ruled that FGT had a “com-pensable interest.” On cross-appeal, FGT argues the trial court misconstrued the parties’ rights and obligations should DOT desire to pave over FGT’s pipelines, and in failing to find that mechanically-stabilized earth walls always constitute a material interference with FGT’s easement rights.
Our standard of review is de novo. Gossett & Gossett, P.A. v. Mervolion, 941 So.2d 1207, 1210 (Fla. 4th DCA 2006) (reviewing a trial court’s interpretation of a contract); Cassell v. India, 964 So.2d 190, 193 (Fla. 4th DCA 2007) (reviewing the denial of a motion for directed verdict); Dorestin v. Hollywood Imports, Inc., 45 So.3d 819, 823 (Fla. 4th DCA 2010) (reviewing a trial court’s ruling on a motion for judgment notwithstanding the verdict).
As we have explained, “the construction of all written instruments is a question of law and belongs to the courts, provided ‘the language used is clear, plain, certain, undisputed, unambiguous, unequivocal, and not subject to conflicting inferences.’ ” Okeelanta Corp. v. Bygrave, 660 So.2d 743, 747 (Fla. 4th DCA 1995) (quoting Friedman v. Va. Metal Prods. Co., 56 So.2d 515, 516 (Fla.1952)). When a contract is unambiguous, “the intent of the parties must be determined from only the four corners of the document.” V & M Erectors, Inc. v. Middlesex Corp., 867 So.2d 1252, 1253-54 (Fla. 4th DCA 2004).
If a contract is ambiguous, however, then “the matter must be submitted to the finder of fact” and extrinsic evidence may be used Critchlow v. Williamson, 450 So.2d 1153, 1156 (Fla. 4th DCA 1984); Crespo v. Crespo, 28 So.3d 125, 128 (Fla. 4th DCA 2010). A contract provision is ambiguous if it is “rationally susceptible to more than one construction.” Segal v. Rhumbline Int’l, Inc., 688 So.2d 397, 398 (Fla. 4th DCA 1997).
DOT argues the trial court erred in allowing the jury to interpret the meaning of compensable interest during their deliberations on breach and damages, and in admitting extrinsic evidence when there was no ambiguity. DOT suggests that compensable interest can only mean “an interest that is capable of being compensated.”
Not surprisingly, DOT and FGT agree on a few things: (1) our standard of review; and (2) the law governing the interpretation of contracts. But, FGT suggests DOT failed to preserve its extrinsic evidence argument by failing to object to the admission of that evidence. Cf. King v. Bray, 867 So.2d 1224, 1226 (Fla. 5th DCA 2004) (“Florida courts generally agree that failure to object to the introduction of par-ol evidence in the trial proceedings waives *1102 the right to invoke the rule on appeal”). Alternatively, FGT argues the 2004 UAM, which was incorporated into the Reimbursable Agreement, defined compensable interest in the context of relocation expenses. As defined, FGT had a compen-sable interest based on the property rights contained within the easement agreements. FGT contends the trial court properly allowed the jury to consider the Reimbursable Agreement in the context of the testimony and UAM, and determine if the agreement was breached and the amount of damages. We agree with FGT.
We have previously held that although both parties contend there is no ambiguity, a paradox can be created. See Okeelanta Corp., 660 So.2d at 747. “ ‘It is a paradox, therefore, that the language which all parties assert (and the court found) to be unambiguous can be rendered ambiguous in fact by the different reasonable constructions advocated for it....’” Id. at 747 (quoting Royal Am. Realty, Inc. v. Bank of Palm Beach & Trust Co., 215 So.2d 336, 338 (Fla. 4th DCA 1968)).
Here, the trial court properly admitted relevant evidence without objection so the fact finder could determine whether the easements or Reimbursable Agreement had been breached. The Reimbursable Agreement incorporated the 2004 UAM by reference. The 2004 UAM defined com-pensable interest.
With that evidence in mind, we agree with the trial court that the easement is a real property right, a compensable interest, entitling FGT to reimbursement. The jury had the benefit of this evidence and determined that DOT breached the Reimbursable Agreement. We see no error in the submission of the “breach” and “damage” issues to the jury.
The second issue involves the easement’s failure to set forth a precise location for the pipeline’s placement. DOT argues the trial court erred in establishing a uniform permanent easement width of “15 feet on each side of Florida Gas’s natural gas pipelines” and establishing a seventy-five foot temporary work space because the easements clearly did not contemplate a permanent width. FGT argues there is no error because permanent width and temporary work areas are consistent with current industry standards and FGT’s needs.
We have de novo review of a trial court’s construction of language in an easement. Terrill v. Coe, 1 So.3d 223, 225 (Fla. 5th DCA 2008).
We find Northwest Pipeline Corp. v. Luna, 149 Idaho 772, 241 P.3d 945 (2010) particularly helpful in resolving this issue. Luna also involved a linear easement without a specified width. The trial court established a width of twenty feet; the Supreme Court of Idaho reversed.
The supreme court explained that, “[wjhile Northwest Pipeline presented evidence that a twenty-foot easement may be necessary for pipeline safety and maintenance under today’s standards, it failed to present substantial evidence of the parties’ intent concerning the intended width of the easement at the time it was granted.” Luna, 241 P.3d at 948. The court further noted that the evidence presented by Northwest Pipeline consisted of “the instrument granting the easement, the testimony of Northwest’s personnel regarding their current excavation practices and pipeline standards, and federal regulations concerning natural gas pipelines. This evidence, taken together, does not support the district court’s finding of a twenty-foot easement.” Id.
The supreme court explained there was no evidence to suggest that the current industry guidelines used by Northwest were “within the contemplation of the parties at the time the easement was grant *1103 ed.” Id. at 949. The court therefore concluded that the plaintiff did not satisfy its burden of demonstrating “the intention of the parties to create a twenty-foot easement or that the twenty-foot easement was necessitated by conditions existing at the time of the grant.” Id. at 948.
Here, the trial court’s award of a permanent easement width and temporary work space—while laudable—was not contemplated by the parties when the easement was created. Although FGT offered evidence concerning modern industry standards and safety concerns, it did not establish that a fixed width was within the contemplation of the parties. We agree with Luna’s reasoning.
The 1958 easement defined the length of its boundaries in metes and bounds, and required the placement of the pipeline to be “at a distance of not less than 40 feet from the outer edge of the payment of the Highway.” The 1967 easement also described the easement’s length in metes and bounds, and required the pipeline not “be any closer than forty (40) feet from the outside edge of the pavement.” Even though the FGT easements incorporate compliance with industry standards, such compliance was limited to the “grade of design, construction, and operation.”
We are further persuaded by another portion of the easement that requires FGT “to conduct its activities in connection with the construction and operation of any and all pipelines which have been, or may be, constructed and operated by [FGT] in such a manner as to interfere to the least possible extent with the overall operation of the [Turnpike].” (Emphasis added). It is the emphasized language which convinces us that the easement width was purposely left vague so that it would cause “the least possible” interference to the Turnpike’s operation.
We also agree that the trial court’s temporary workspace for “construction, repair, and removal of its natural gas pipelines” was likewise intentionally left open. While the testimony supported the seventy-five foot award of temporary workspace, the project-by-project approach that the easements suggest would leave that space open and dependent on the needs of the particular relocation. This would also comply with the language requiring FGT to interfere with the Turnpike to the least extent possible.
On cross-appeal, FGT challenges the trial court’s ruling on what happens when the Turnpike needs to pave over existing pipeline. The trial court’s finding that DOT was prohibited from paving over FGT’s pipelines except at road crossings without FGT’s consent is consistent with the easements’ language. Both easements state that FGT’s pipelines will not be less than forty feet from the edge of the roadway’s pavement.
Evidence indicated that the easements allow pavement over FGT’s pipelines only at “toll plazas, ramps, and crossings.” The inclusion of those locations indicates that DOT was not permitted to pave over FGT pipelines in other locations. We therefore find no error in the trial court’s conclusion concerning what happens when DOT intends to pave over the pipeline and requiring FGT to pay for relocation if it does not consent to the Turnpike paving over the pipeline.
However, the last sentence of the final judgment concerning this issue fails to take into consideration paragraph 10 of the 1967 easement. That provision requires DOT to implement alternative measures, where feasible, to prevent FGT from having to relocate its pipelines. We therefore direct the trial court, upon remand, to revise part “c” of the final judgment to make reference to DOT’S obli *1104 gation to seek reasonable alternatives to relocation.
Finally, FGT argues the trial court improperly declined to rule that mechanically-stabilized earth walls will always constitute a material interference when placed within fifteen feet of its "pipelines. DOT responds that the testimony does not support such a finding.
The owner of the land on which the easement exists may not interfere with the rights of the easement-holder. Stephens v. Dobbins, 511 So.2d 652, 653 (Fla. 2d DCA 1987). “[A]n easement which grants the right to operate a natural gas pipeline must, if the easement is not to be wholly illusory, imply the right to operate the pipeline in accordance with applicable federal laws and regulations.” Swango Homes, Inc. v. Columbia Gas Transmission Corp., 806 F.Supp. 180, 185 (S.D.Ohio 1992); Mid-America Pipeline Co. v. Lario Enters., Inc., 942 F.2d 1519, 1527 (10th Cir.1991) (holding that installation of an asphalt surface and structures within the subject easement interfered with the normal operation and maintenance of pipelines).
While the evidence established that mechanically-stabilized earth walls constitute a material interference when they are placed “in close proximity” to FGT’s pipelines, no such evidence supports the proposition that they always constitute a material interference when they are placed “within fifteen feet” of FGT’s pipelines. We therefore agree with the trial court’s conclusion on this issue.

The Finale

We affirm the trial court’s ruling in all respects except for the permanent easement and temporary space width determination and that part of the final judgment that fails to make reference to DOT’S obligation to seek reasonable alternatives to relocation.
Affirmed in part; Reversed in pari; and Remanded.
GROSS and DAMOORGIAN, JJ, concur.

. The relevant version was the Utility Accommodation Manual, revised August 2004.

. At trial and during the post-trial motions, DOT maintained that it never actually “served an order” regarding relocation, and therefore the easement agreements controlled who paid for relocation expenses. That argument appears to have been abandoned on appeal.

. In February 2007, DOT sent FGT a letter stating that it was terminating the Reimbursable Agreement.