# IN THE COURT OF APPEALS OF TENNESSEE AT JACKSON
## April 9, 2024 Session

## JANET DOE v. CITY OF MEMPHIS, TENNESSEE

**Appeal from the Circuit Court for Shelby County**
**No. CT-003516-14      Gina C. Higgins, Judge**

---

### No. W2023-01248-COA-R9-CV

---

Shortly after the City of Memphis ("the City") made public announcements regarding untested sexual assault kits, three women filed a class action complaint alleging that the announcements caused them severe emotional distress. More than a year after the announcements, the plaintiffs amended the complaint to add a new plaintiff. The three original plaintiffs' claims were either voluntarily dismissed or dismissed by the trial court based upon the statute of limitations. The City sought summary judgment against the only remaining plaintiff on the ground that her claims were time-barred. The trial court denied the motion for summary judgment, and this Court granted the City's petition for an interlocutory appeal. Concluding that the applicable statute of limitations barred the new plaintiff's claims, we reverse the trial court's decision and remand.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Circuit Court Reversed and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and ARNOLD B. GOLDIN, J., joined.

Jonathan P. Lakey, John Joseph Cook, Lani Danielle Lester, and Robert D. Meyers, Memphis, Tennessee, for the appellant, City of Memphis.

Gary K. Smith, C. Philip M. Campbell, Daniel Owen Lofton, and Paul Forrest Craig, Memphis, Tennessee, for the appellee, Janet Doe.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

In 2012, police arrested Anthony Alliano for raping at least eight women in the Memphis area over the course of nearly ten years. Ultimately, Mr. Alliano was convicted of the rapes, and he received a sentence of 178 years in prison. The investigation that led

to Mr. Alliano's arrest brought to light concerns that the City had a substantial backlog of untested sexual assault kits ("SAKs").  On August 19, 2013, the City's police director made a public media disclosure that the City had approximately 2,000 untested SAKs.  In October 2013, the City's police director made a second media disclosure to inform the public that the City, in fact, had over 12,000 untested SAKs.

On August 15, 2014, Meaghan Ybos, Madison Graves, and Rachel Johnson (collectively, "the initial plaintiffs") filed a complaint against the City and Shelby County, Tennessee[1] on behalf of themselves and as "class representatives for all others similarly situated."  Relying on the Tennessee Governmental Tort Liability Act ("GTLA"), Tenn. Code Ann. §§ 29-20-101 to -408, the initial plaintiffs asserted claims for negligent infliction of emotional distress and reckless infliction of emotional distress.  These plaintiffs alleged the following facts in support of their claims:  they were sexually assaulted by an unknown assailant in May 2003 (Ms. Ybos and Ms. Graves) or in June 2010 (Ms. Johnson); shortly after their sexual assaults, each participated in a forensic examination that yielded evidence that was placed in a SAK; and years later, it was determined that Mr. Alliano was the assailant who raped all three women. The initial plaintiffs alleged that they all suffered severe emotional distress due to the City's mishandling of their SAKs, which allowed Mr. Alliano to remain at large when he "might otherwise have been apprehended" and due to the City's "shocking and haphazard" public media disclosures in August and October 2013. The initial plaintiffs stated in the complaint that these factual allegations were "typical of and substantially similar to those of the other class claimants."

On September 23, 2014, the initial plaintiffs filed an amended complaint that asserted the same claims but added the following request for damages:

> For all of these reasons, the claimants are entitled to the maximum available recovery under the Tennessee Governmental Tort Liabilities Act. Specifically, Plaintiffs demand $1,400,000.00 (one million four hundred thousand and 00/100 dollars) with maximum recovery of $700,000 (seven hundred thousand dollars) per governmental defendant, County and City.

More than a year later, on October 16, 2015, the initial plaintiffs amended the complaint a second time.  The second amended complaint asserted the same claims but added Janet Doe as a plaintiff and identified her as the "lead class representative," while Ms. Ybos was removed from the case entirely.[2]  The second amended complaint also added the following factual allegations pertaining to Ms. Doe:  she was sexually assaulted by an unknown assailant in June 1997; the same day as the assault, she underwent a forensic examination

---

[1] The record contains no order dismissing Shelby County from the lawsuit, but the county is not a party to this appeal.

[2] In an order entered on December 17, 2015, the trial court dismissed Ms. Ybos's claims as time-barred.

yielding biological and trace evidence that was placed in a SAK; and, as of August and October 2013, the City had neither apprehended her assailant nor submitted her SAK for DNA testing. According to the second amended complaint, Ms. Doe suffered severe emotional distress due to the City's failure to test her SAK and to apprehend her assailant. Additionally, the second amended complaint increased the damages demand, stating as follows:

> For all of these reasons, the claimants are entitled to maximum available recovery under the Tennessee Governmental Tort Liabilities Act. Once the class of claimants herein is certified, Plaintiffs[] will submit a statement of damages applicable to each class member. The Plaintiffs estimate that upon class certification, their collective provable damages will be approximately $10,000,000.00 (Ten million and 00/100 dollars). Plaintiffs demand the same from these Defendants. The Tennessee Governmental Tort Liabilities Act provides for a cap on damages at $700,000 per occurrence; this is based on the occurrence of an individual injury. Each Plaintiff in this case suffered separate injuries, and each of these injuries occurred at a specific date and time. There is not one occurrence of injuries as it concerns these Plaintiffs and as it concerns the pending class claimants in this matter. This lawsuit concerns an epic scandal which has been developing over decades and which has had catastrophic consequences on the Plaintiffs and the pending class claimants. Each Plaintiff's individual injury is capped at a $700,000 recovery. Upon class certification, the whole group of claimants will collectively be in a position to demand $10,000,000.00 from these Defendants.

On May 9, 2018, the City filed three motions for summary judgment. Two of the motions pertained to Ms. Graves and Ms. Johnson and argued that they did not present valid claims because the undisputed facts showed that their SAKs were not mishandled. In particular, the City contended that Ms. Graves's SAK was submitted to the Tennessee Bureau of Investigation ("TBI") seven days after her assault, the results of the test were entered into the Combined DNA Index System ("CODIS") database,[3] and her assailant was

---

[3] The Tennessee Supreme Court has described CODIS as follows:

CODIS, which is a computer software program, is a three-tiered system that allows DNA-related information to be shared between local agencies, or local DNA index systems ("LDIS"), state agencies, or state DNA index systems ("SDIS") and the FBI, or the National DNA Index System ("NDIS"). [David E.] Newton, *DNA Evidence [and Forensic Science]* at 47 [(Infobase Publ'g 2008)]; *see also LDIS, SDIS, and NDIS*, DNA Initiative, http://www.dna.gov/solving-crimes/cold-cases/howdatabasesaid/codis/ (last visited June 6, 2011). CODIS contains two indexes: a convicted offender index, which contains the DNA profiles of persons convicted of particular crimes, and the forensic index, which contains DNA profiles obtained from crime scene evidence. *Basics of How CODIS Works,* DNA Initiative, http://www.dna.gov/dna-databases/codis (last visited June 14, 2011).

later identified as Mr. Alliano when his DNA was entered into the CODIS database. Regarding Ms. Johnson, the City asserted that her SAK was submitted to the TBI for testing the day after her assault, the results were loaded into the CODIS database, and her assailant was later identified as Mr. Alliano when his DNA was entered into the CODIS database.

The City also filed a motion for summary judgment as to Ms. Doe's claims on May 9, 2018. According to the City, the undisputed facts showed that Ms. Doe admitted that any claim she had against the City arose on or before the first week of August 2014. She did not become a party to the case or assert any claims against the City, however, until fourteen months later on October 16, 2015. Thus, the City argued, her claim was time-barred because she did not commence her GTLA action within twelve months after it arose as required by Tenn. Code Ann. § 29-20-305(b).

Although all three complaints filed in the case purported to be class action complaints, no class had been certified nor had a motion seeking class certification pursuant to Tenn. R. Civ. P. 23 been filed at the time the City filed its motions for summary judgment. The plaintiffs did not file a motion seeking class certification until October 12, 2018—five months after the City filed its motions for summary judgment and more than four years after the lawsuit began. Thereafter, nothing significant was filed in the case until January 8, 2021, when Ms. Doe filed her response to the City's motion for summary judgment. She argued that her claim was not time-barred because, when the initial plaintiffs filed the original complaint "on behalf of other class claimants[, it] toll[ed] the statute of limitations as to later class plaintiffs." Ms. Johnson and Ms. Graves voluntarily dismissed their claims in March and May 2021, respectively, leaving Ms. Doe as the sole named plaintiff.

On February 26, 2021, Ms. Doe filed a motion for partial summary judgment "as to the liability/fault of the City of Memphis for its admitted and publicly announced failures in the mishandling and significant delay in testing of more than 12,000 sexual assault kits." In other words, Ms. Doe argued, the City's public announcement that it had more than 12,000 untested SAKs meant there was no dispute that the City breached the applicable standard of care by not testing her SAK. The City opposed Ms. Doe's motion, arguing that a genuine issue of material fact existed regarding whether it breached the applicable standard of care by not testing Ms. Doe's SAK because her SAK pre-dated the CODIS database, meaning that the applicable standards at the time of the investigation into her

---

CODIS "'allows State and local forensics laboratories to exchange and compare DNA profiles electronically in an attempt to link evidence from crime scenes for which there are no suspects to DNA samples of convicted offenders on file in the system.'" *Banks v. United States*, 490 F.3d 1178, 1181 (10th Cir. 2007) (quoting H.R.Rep. No. 106-900(I), at 8 (2000), *reprinted in* 2000 U.S.C.C.A.N. 2323, 2324).

*Powers v. State*, 343 S.W.3d 36, 45-46 (Tenn. 2011) (footnote omitted).

assault did not require testing of no-suspect SAKs like hers due to there being no DNA database to use as a comparator. The City also asserted that genuine issues of material fact existed regarding the City's immunity under the GTLA and/or under the public duty doctrine.

After hearing arguments on the motion for class certification and the parties' motions for summary judgment, the trial court announced its rulings, which were reflected in three written orders entered on August 16, 2023. In the first order, the court denied the City's motion for summary judgment after concluding that Ms. Doe's claim was not time-barred. The trial court also ruled that the City was not immune under the public duty doctrine based upon its conclusion that the City had a special relationship with the potential class members because it invited sexual assault victims to submit to SAKs, creating an expectation that the City would do more for them.

In the second August 16, 2023 order, the trial court denied Ms. Doe's motion for partial summary judgment as to the City's liability after finding that material disputes of facts existed, particularly because there was no standard in place and no DNA comparative database when Ms. Doe's sexual assault occurred. In the third August 16, 2023 order, the trial court granted Ms. Doe's motion for class certification.

The City filed an application for interlocutory appeal pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure which this Court granted as to the following issues: whether the trial court erred in concluding that Ms. Doe's action was not time-barred under Tenn. Code Ann. § 29-20-305(b) and whether the trial court erred in concluding that the City was not immune under the public duty doctrine.

STANDARD OF REVIEW

We review a trial court's summary judgment determination de novo, with no presumption of correctness. *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015). This means that "we make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." *Id.* We "must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor." *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002); *see also Acute Care Holdings, LLC v. Houston Cnty.*, No. M2018-01534-COA-R3-CV, 2019 WL 2337434, at *4 (Tenn. Ct. App. June 3, 2019).

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." TENN. R. CIV. P. 56.04. A disputed fact is material if it is determinative of the claim or defense at issue in the motion. *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008) (citing *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993)). When a party

moves for summary judgment but does not have the burden of proof at trial, the moving party must submit evidence either "affirmatively negating an essential element of the nonmoving party's claim" or "demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense." *Rye*, 477 S.W.3d at 264. Once the moving party has satisfied this requirement, the nonmoving party "'may not rest upon the mere allegations or denials of [its] pleading.'" *Id.* at 265 (quoting TENN. R. CIV. P. 56.06). Rather, the nonmoving party must respond and produce affidavits, depositions, responses to interrogatories, or other discovery that "set forth specific facts showing that there is a genuine issue for trial." TENN. R. CIV. P. 56.06; *see also Rye*, 477 S.W.3d at 265. If the nonmoving party fails to respond in this way, "summary judgment, if appropriate, shall be entered against the [nonmoving] party." TENN. R. CIV. P. 56.06. If the moving party fails to show he or she is entitled to summary judgment, however, "'the non-movant's burden to produce either supporting affidavits or discovery materials is not triggered and the motion for summary judgment fails.'" *Martin*, 271 S.W.3d at 83 (quoting *McCarley v. W. Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998)).

ANALYSIS

Because it is outcome-determinative, we begin with the City's argument that the trial court erred in concluding that Ms. Doe's claim was not time-barred under Tenn. Code Ann. § 29-20-305(b). The City's argument here focuses on two points: (1) that class action tolling does not apply to toll the 12-month statute of limitations in Tenn. Code Ann. § 29-20-305(b), and (2) that Ms. Doe's claims do not relate back under Tenn. R. Civ. P. 15.03. We will address each in turn.

A. Was the statute of limitations tolled?

Under Tenn. Code Ann. § 29-20-305(b), a GTLA claim "must be commenced within twelve (12) months after the cause of action arises." Ms. Doe alleged that she first suffered injury in August 2014 when she received word of the City's public announcements in August and October 2013 regarding untested SAKs. She was not, however, added as a plaintiff until the filing of the second amended complaint on October 16, 2015—fourteen months after her cause of action arose. Nevertheless, the trial court concluded that her claim against the City was not time-barred by the twelve-month statute of limitations in Tenn. Code Ann. § 29-20-305(b). The court reached this conclusion after finding that the original complaint filed on August 15, 2014, equitably tolled the twelve-month statute of limitations under the "class action tolling rule" set forth by the United States Supreme Court in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974). Under *American Pipe's* tolling doctrine, "the commencement of the original class suit tolls the running of the statute [of limitations] for all purported members of the class who make timely motions to intervene after the court has found the suit inappropriate for class action status." 414 U.S. at 553. Thus, when a federal court denies class certification, the purported

- 6 -

members of the class may intervene in the pending action or file individual lawsuits within the statute of limitations period, which commences on the date the court denied class certification.

The City contends that the trial court erred in relying on the holding in *American Pipe* because Tennessee has declined to recognize any form of equitable tolling, class action tolling, or otherwise. As the City correctly points out, the Tennessee Supreme Court has stated that, "unlike other state courts and the federal courts, we have declined to recognize the doctrine of equitable tolling in civil cases." *Redwing v. Cath. Bishop for Diocese of Memphis*, 363 S.W.3d 436, 460 (Tenn. 2012); *see also Brashears v. City of Knoxville Police Dep't*, No. 03A01-9809-cv-00298, 1999 WL 93582, at *5 (Tenn. Ct. App. Feb. 25, 1999). The City also correctly points out that the Tennessee Supreme Court has previously declined to adopt class action tolling.[4] *See Maestas v. Sofamor Danek Grp., Inc.*, 33 S.W.3d 805, 808 (Tenn. 2000). We believe, however, that the City's argument paints with too broad a brush.

In *Tigg v. Pirelli Tire Corp.*, 232 S.W.3d 28, 30 (Tenn. 2007), the plaintiffs appealed the dismissal of their action against their former employer as untimely, arguing that the previous commencement of a class action against the employer by other former employee plaintiffs tolled the statute of limitations. The Tennessee Supreme Court examined the holding in *American Pipe* and noted that it had previously declined to adopt a class action tolling rule "where the original class action was filed in federal court, class certification was denied, and the plaintiffs subsequently filed an untimely lawsuit raising the same claims in a Tennessee state court." *Id.* at 33 (citing *Maestas*, 33 S.W.3d at 808). As the Court explained:

> In *Maestas*, one of the reasons we rejected a cross-jurisdictional tolling rule was that it would not serve the purpose outlined in *American Pipe*, in that numerous protective filings by individual class members in a federal class action case would not impact our state courts. [*Maestas*, 33 S.W.3d] at 808. Additionally, because few states allow cross-jurisdictional tolling, we noted that adopting a cross-jurisdictional tolling rule could result in an increase in the number of cases filed by plaintiffs from other states. *Id.* Our decision also rested on the conclusion that such a cross-jurisdictional tolling rule would "essentially grant to federal courts the power to decide when Tennessee's statute of limitations begins to run." *Id.* at 809.

*Id.*

---

[4] The United States Supreme Court has described *American Pipe's* class action tolling rule as a form of equitable tolling. *Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 582 U.S. 497, 510 (2017).

Although the *Tigg* Court emphasized that Tennessee rejected cross-jurisdictional class action tolling, the Court recognized that there was another form of class action tolling "known as intrajurisdictional tolling, which tolls statutes of limitations *within the same court system* during the pendency of a class action for potential members of the class." *Id.* The Court stated as follows:

> "We recognize that several jurisdictions have adopted *intrajurisdictional* tolling. *See Wade v. Danek Med., Inc.*, 182 F.3d 281, 286-87 (4th Cir. 1999) (citing multiple authorities); *Staub v. Eastman Kodak Co.*, 320 N.J. Super. 34, 726 A.2d 955, 963-64 (N.J. Super. Ct. App. Div. 1999) (same). "Tolling the statute of limitations for individual actions filed after the dismissal of a class action is sound policy when both actions are brought in the same court system." *Portwood v. Ford Motor Co.*, 183 Ill. 2d 459, 233 Ill. Dec. 828, 701 N.E.2d 1102, 1104 (Ill. 1998). The rationale for that rule is that if the statute of limitations were not tolled, that single system would be burdened both by the class action litigation and by numerous protective filings from the members of the class seeking to preserve their rights to bring suit individually should class certification be denied. *See id.*; *see also Wade*, 182 F.3d at 286."

*Id.* (quoting *Maestas,* 33 S.W.3d at 808).

The *Tigg* plaintiffs urged our Supreme Court to adopt an intrajurisdictional tolling rule and argued that their complaint would be considered timely filed under such a rule. *Id.* at 34. The Court never reached the intrajurisdictional tolling issue, however, because the Court concluded that, even if it adopted an intrajurisdictional tolling rule, the plaintiffs' claims would still be barred by the statutes of limitations applicable to their claims due to the previous plaintiffs' failure to protect the other potential members of the class. *Id.* at 35. Specifically, the previous plaintiffs failed to seek class certification within the sixty-day time period provided under the trial court's local rule, and the Court held that that failure "ha[d] the same effect upon the tolling of the statutes of limitations as a denial of class certification." *Id.*

Based on the analysis in *Tigg*, we agree with Ms. Doe that our Supreme Court may be open to the idea of adopting an intrajurisdictional tolling rule. But, as in *Tigg*, even if an intrajurisdictional tolling rule was adopted, it would not save her claim. The GTLA reaffirms the doctrine of sovereign immunity and "merely removes immunity in certain limited and enumerated circumstances." *Lynn v. City of Jackson*, 63 S.W.3d 332, 337 (Tenn. 2001) (citing Tenn. Code Ann. § 29-20-201(a)). This limited waiver of immunity is in derogation of the common law. *Moreno v. City of Clarksville*, 479 S.W.3d 795, 809 (Tenn. 2015). "'Generally, statutes in derogation of the common law are to be strictly construed and confined to their express terms, and that rule of construction has been expressly incorporated into the [GTLA].'" *Id.* (quoting *Doyle v. Frost*, 49 S.W.3d 853, 858 (Tenn. 2001)). Thus, "'any claim for damages must be brought in strict compliance

with the terms of [the GTLA],'" and "[o]ne of the terms of the GTLA which demands strict compliance is the statute of limitations." *Lynn*, 63 S.W.3d at 337 (quoting Tenn. Code Ann. § 29-20-201(c)). As we have explained:

> Where a statute creates a new liability or extends a new right to bring suit and that statute provides a time period within which to bring the action, that period
>> "operates as a limitation of the liability itself as created, and not of the remedy alone. It is a condition attached to the right to sue at all." "Time has been made the essence of the right, and that right is lost if the time is disregarded." As thus defined, the right of action is conditional. The limitation inheres in the right itself.

*Williams v. Memphis Light, Gas & Water Div.*, 773 S.W.2d 522, 523 (Tenn. Ct. App. 1988) (quoting *Auto. Sales Co. v. Johnson*, 122 S.W.2d 453, 457-458 (Tenn. 1938) (quoting *The Harrisburg*, 119 U.S. 199, 214 (1886)); *see also Boone v. Town of Collierville*, 593 S.W.3d 156, 162 (Tenn. Ct. App. 2019). In other words, "Tennessee law views the twelve-month limitation period for bringing an action under the GTLA as a condition precedent which must be met. If suit is not filed within the statutory period, both the right and the remedy is extinguished." *Lynn*, 63 S.W.3d at 337.

Because the GTLA must be strictly construed, "courts have refused to apply statutes and rules to cases arising under the GTLA if application of the particular statute or rule would effectively expand the statute of limitations period set forth in T.C.A. § 29-20-305(b)." *Sutton v. Barnes*, 78 S.W.3d 908, 913 (Tenn. Ct. App. 2002);[5] *see, e.g.*, *Cunningham v. Williamson Cnty. Hosp. Dist.*, 405 S.W.3d 41, 46 (Tenn. 2013) (holding that the 120-day extension provided in Tenn. Code Ann. § 29-26-121(c) does not apply to extend the time within which medical malpractice actions may be brought under the GTLA); *Lynn*, 63 S.W.3d at 337-38 (holding that neither the savings statute in Tenn. Code Ann. § 28-1-105 nor the federal supplemental jurisdiction statute, 28 U.S.C. § 1367(d), "tolls the GTLA statute of limitations"); *Doe v. Goodwin*, 254 S.W.3d 428, 431 (Tenn. Ct. App. 2007) (affirming dismissal of claims against county regarding a teacher's sexual

---

[5] In *Sutton*, we concluded that the discovery rule applied to the 12-month statute of limitations in Tenn. Code Ann. § 29-20-305(b) because:

> [A]pplication of the discovery rule would not *expand* the 12-month period in which a plaintiff has to file suit under the GTLA. The plaintiff must still file its action within 12 months of the date on which the cause of action "arises"; the discovery rule merely operates to determine when the 12 months starts to run.

*Sutton*, 78 S.W.3d at 916-17.

assault of a minor because the GTLA's 12-month statute of limitations was not tolled by plaintiff's minority).

Our review of the foregoing principles leads us to conclude that, even if Tennessee courts recognized a class action tolling rule, it would not apply to cases involving the GTLA because application of the rule would effectively expand the 12-month statute of limitations in Tenn. Code Ann. § 29-20-305(b). Any such extension would contradict the GTLA's demand for strict compliance with the statute of limitations. *See Lynn*, 63 S.W.3d at 337. Extension of the 12-month statutory period is the purview of the legislature, not the judiciary. *See Moreno*, 479 S.W.3d at 811 (noting that the 12-month statutory period in Tenn. Code Ann. § 29-20-305(b) may be extended "only if legislative intent to do so is expressly stated in the text of the inconsistent statute"); *Williams*, 773 S.W.2d at 523 (declining to extend 12-month period in Tenn. Code Ann. § 29-20-305(b) because "[t]he legislature could have made T.C.A. § 28-1-105 applicable to the [GTLA], however, it has chosen not to do so"). Thus, we conclude that the trial court erred in ruling that, under the class action tolling rule, the filing of the initial complaint tolled the running of the twelve-month statute of limitations in Tenn. Code Ann. § 29-20-305(b).

B. Did Ms. Doe's claims relate back under Rule 15.03?

Our determination of whether Ms. Doe's claims were timely does not end with our conclusion that the statute of limitations was not tolled. We must next consider whether her claim was timely because it related back to the original complaint under Tenn. R. Civ. P. 15.03. Rule 15 of the Tennessee Rules of Civil Procedure governs how a party may amend a pleading. In particular, Tenn. R. Civ. P. 15.03 states as follows:

> Whenever the claim or defense asserted in amended pleadings arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment changing the party or the naming of the party by or against whom a claim is asserted relates back if the foregoing provision is satisfied and if, within the period provided by law for commencing an action or within 120 days after commencement of the action, the party to be brought in by amendment (1) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

TENN. R. CIV. P. 15.03. Under this rule,

> amendments to the pleadings to substitute or change the name of a party will be considered filed on the date of the original pleading so long as the party

- 10 -

affected by the amendment had notice of the suit during the limitations period (or within 120 days of the filing date) and knew or should have known that, but for a mistake as to its identity, the suit would have been brought against it.

*Doyle*, 49 S.W.3d at 856.  As our Supreme Court has stated, "the purpose behind the Rule is to 'ameliorate the effect of a statute of limitations where the plaintiff has sued the wrong party but where the right party has had adequate notice of the institution of the action.'" *Id.* (quoting *Bloomfield Mech. Contracting, Inc. v. Occupational Safety & Health Rev. Comm'n*, 519 F.2d 1257, 1262 (3d Cir. 1975)).

Given that Ms. Doe filed her claim pursuant to the GTLA, our analysis of this issue begins with considering whether Rule 15.03 conflicts with the GTLA's requirement of strict compliance with the statute of limitations in Tenn. Code Ann. § 29-20-305(b).  The Tennessee Supreme Court addressed that question in *Doyle v. Frost* and held that there was no conflict because "the relation back doctrine embodied in Rule 15.03 does not extend or enlarge the applicable statute of limitations period, for amendments pursuant to the rule are considered filed on the date of the original, timely pleading."  49 S.W.3d at 860.  The Court explained that, because Rule 15.03 "requires that the affected party receive sufficient notice of the action, the 'relation back' doctrine embodied by the Rule does not compromise the protections afforded by the statute of limitations."  *Id.* at 858.  Therefore, if the requirements of Rule 15.03 were satisfied, Ms. Doe's claim may relate back to the original, timely-filed complaint.

Turning to the requirements of Rule 15.03, this Court has held that an amendment seeking to change or add a new plaintiff must satisfy three requirements for it to relate back to a previous pleading:

> The three primary considerations . . . in determining whether an amendment seeking to add or substitute a new party plaintiff would be allowed to relate back . . . to the date of the original pleading so as to avoid the statute of limitations, have been (1) whether the defendant received adequate notice of the claim against him; (2) whether the relation back of such an amendment would unfairly prejudice the defendant; and (3) whether there is an "identity of interest" between the original party plaintiff and the new party plaintiff.

*Osborne Enters., Inc. v. City of Chattanooga*, 561 S.W.2d 160, 164 (Tenn. Ct. App. 1977); *see also Tolliver v. Tellico Vill. Prop. Owners Assoc., Inc.*, 579 S.W.3d 8, 17-18 (Tenn. Ct. App. 2019).  We will consider each of these requirements in relation to the circumstances of this case.

1.  Did the City have adequate notice of Ms. Doe's claim?

When considering Rule 15.03's notice requirement, courts focus on the original pleadings to determine whether the defendant had fair notice "that a legal claim existed in, and was in effect being asserted by, the party belatedly brought in." *Osborne*, 561 S.W.2d at 164. This Court has explained that "[t]he existence of fair notice from the original complaint that the newly-added plaintiff's claim is involved ensures that the defendants suffer no prejudice from the amendment." *Biscan v. Brown*, No. M2001-02766-COA-R3-CV, 2003 WL 22955933, at *4 (Tenn. Ct. App. Dec. 15, 2003) (citing *Braswell v. Carothers*, 863 S.W.2d 722, 727 (Tenn. Ct. App. 1993)). The City contends that Ms. Doe's claim fails to satisfy the notice requirement because the original complaint did not provide the City with adequate notice that Ms. Doe's particular claims were also involved.

What constitutes fair notice that a claim was in effect being asserted by a belatedly-brought-in plaintiff? The case of *Osborne Enterprises, Inc. v. City of Chattanooga* provides guidance on this issue. In that case, a corporation filed an inverse condemnation action seeking damages for the cutting of trees and the loss of air space on the property of its wholly-owned subsidiary. *Osborne*, 561 S.W.2d at 162. After the expiration of the one-year statute of limitations, the trial court permitted the corporation to amend its original complaint to add its wholly-owned subsidiary as a co-plaintiff and concluded that the amendment would relate back to the original complaint under Rule 15.03. *Id.* at 163. On appeal, we applied the three Rule 15.03 requirements and concluded that the trial court did not err. *Id.* at 163-66. Regarding the notice requirement, we explained that the original complaint provided adequate notice because:

> "In determining whether the adversary has had fair notice, the usual emphasis of 'conduct, transaction or occurrence' is on the operational facts which give rise to a claim by a particular party based on any one or all of the theories conjured up, whether timely or belatedly. But when it comes to a late effort to introduce a new party, something else is added. Not only must the adversary have notice about the operational facts, but it must have had fair notice that a legal claim existed in, and was in effect being asserted by, the party belatedly brought in. This becomes of special importance in situations in which a common set of operational facts gives rise to distinct claims (or defenses) among distinct claimants (or defendants)."
>
> Once the defendant has fair notice from the original pleadings that the new party's claim is also involved, then the defendant has suffered no prejudice. Here, the plaintiffs' original complaint sufficiently identifies the property allegedly damaged by defendants so as to prevent any unfair prejudice to the defendants in bringing in the new plaintiff who had record title to the land. The theories of recovery, the type and extent of damage occurring and the type of recovery sought are clearly apparent from the complaint.

- 12 -

*Id.* at 164 (quoting *Williams v. United States*, 405 F.2d 234, 236-38 (5th Cir. 1968)).

The case of *Lane v. Daniel*, No. W2012-01684-COA-R3-CV, 2013 WL 2325620 (Tenn. Ct. App. May 29, 2013), is also instructive on what satisfies the notice requirement. In that case, the original plaintiff, Berlinda Lane, sustained injuries in an automobile accident on April 20, 2008. *Lane*, 2013 WL 2325620, at *1. She filed the original complaint on April 8, 2009, but in the interim between the accident and the filing of the complaint, she initiated a Chapter 7 bankruptcy case. *Id.* On February 25, 2010, the trustee of her bankruptcy case filed a motion to intervene in the tort case. *Id.* After being permitted to intervene, the trustee filed an intervening complaint on January 12, 2011, which adopted the allegations in the original complaint verbatim, except to substitute the trustee as the real party in interest. *Id.* at *1-2. The defendant filed a motion to dismiss the intervening complaint on the basis that it was barred by the applicable statute of limitations. *Id.* at *2. The trial court granted the motion and dismissed the case. *Id.*

On appeal, this Court reversed, finding that the intervening complaint related back to the original complaint under Rule 15.03. *Id.* at *12. In particular, the court, like the *Osborne* court, focused on the operative facts in the original complaint and held as follows regarding the notice requirement:

> [T]he operative facts in the Trustee's complaint are identical to the operative facts in Ms. Lane's complaint. Indeed, the Trustee's complaint merely adopts and incorporates the allegations contained in Ms. Lane's original complaint. The question is thus whether having notice of the claim asserted by Ms. Lane also put the Appellees on notice of the claim asserted by the Trustee. *See Osborne*, 561 S.W.2d at 164 (requiring that the defendant have "fair notice that a legal claim existed in, and was in effect being asserted by, the party belatedly brought in."). The situation in this case is similar to the situation in *Braswell v. Carothers*, 863 S.W.2d 722 (Tenn. Ct. App. 1993). The *Braswell* Court focused on the question of whether the defendant had "fair notice from the original pleadings that the new parties' *claim* is also involved." *Id.* at 727 (emphasis added). The Court noted the fact that the "operational facts in the original complaint are identical to those in the amended complaint." *Id.* Because the claim was identical in both the original complaint and the amended complaint, the *Braswell* Court held that the defendants were on notice of the new claim and that "defendants suffer[ed] no prejudice from the substitution." *Id.* Likewise, in this case, the claim asserted by the Trustee is identical to the claim asserted by Ms. Lane; accordingly, the Appellees had fair notice of the *claim* being asserted at the time Ms. Lane filed and served her complaint.

*Id.* at *11.

- 13 -

Applying these principles, we now consider the operative facts of the prior pleadings and those of the second amended complaint.

### (a) Operative facts are substantially different

An examination of the operative facts in the previous pleadings and the second amended complaint shows that, unlike in *Lane* and *Osborne*, they are significantly different. In particular, the initial plaintiffs' assaults occurred in 2003 and 2010, but Ms. Doe's assault occurred in 1997, which was prior to the 2002 advent of CODIS. The City supported its motion for summary judgment with the affidavit of Memphis Police Assistant Chief Donald Crowe, who explained the significance of Ms. Doe's assault occurring pre-CODIS as follows:

> As [Ms. Doe's] sexual assault occurred in 1997, consistent with professional investigation standards, Ms. Doe's SAK was not submitted for DNA testing during the investigation because the DNA testing would only be conducted if a suspect had already been identified. In 1997 there was no DNA database available to MPD to compare to the DNA from a "no-suspect" SAK. Because no suspect had been identified in her case, Ms. Doe's SAK was not submitted for DNA testing. Further, MPD did not have the authority to submit an SAK for testing without direction and consent from the Shelby County District Attorney.

Chief Crowe further explained that, when CODIS first became available, it "enhanced DNA as a potential tool in "no-suspect" cases, [but] it immediately created an issue for pre-CODIS SAKs, like Ms. Doe's, which had not yet been tested." He stated as follows:

> 11. When CODIS first became available, submission of all of the City's pre-CODIS SAKs (some dating back to the 1980s) would not have been possible or feasible, in part because submission of large numbers of older SAKs would substantially slow-down the process for open investigations which had priority over "cold" cases like Ms. Doe's case.
> 12. At the time, the issue of how to prioritize, track and fund the testing of pre-CODIS SAKs was not limited to Memphis, but was a national issue that needed to be evaluated and an appropriate process developed. Because of the novelty and complexity of the SAK inventory issue, there were no standards in place requiring the testing of all untested SAKs. . . . [T]he National Institute of Justice ("NIJ") did not develop and publish recommended guidelines for addressing the issue of "backlog" SAKs until 2016.
> . . .
> 14. In addition, sufficient local funding for testing all historic SAKs did not become available until much later. As late as February 2014, the City still

- 14 -

needed an additional $5.5 million and had to conduct community outreach programs aimed at private sources to obtain the necessary funds.

15.  The allocation of necessary resources and funding to projects within the MPD is purely discretionary and involves the assessment of priorities on several different levels.  For example, if higher level law enforcement personnel are needed on a given special project, then they necessarily will need to be removed from their ordinary responsibilities.

Chief Crowe acknowledged that the Tennessee Bureau of Investigation ("TBI") had a DNA testing program in 2003 that provided testing for the backlog of untested SAKs. He explained, however, that not submitting all untested SAKs to this program did not deviate from professional investigative standards because "[t]he 2003 TBI program was very limited in scope and time and was not intended to test all untested SAKs.  The original objective was only to test a maximum of 2,500 SAKs for the entire state.  Ultimately, only 618 SAKs state-wide were submitted, 225 of which came from the City."  Thus, the fact that Ms. Doe's assault occurred pre-CODIS is a significant difference because the professional investigation standards at that time, unlike those at the time of the initial plaintiffs' assaults, did not require that Ms. Doe's SAK be submitted for DNA testing if there had been no suspect identified. And, after the advent of CODIS, there were insufficient resources and no guidelines for submitting the backlog of untested SAKs.

The pre/post CODIS distinction is not the only significant difference in the operative facts of the prior pleadings and the second amended complaint.  For instance, the operative facts of the original complaint alleged that all of the initial plaintiffs had been assaulted by the same perpetrator, Mr. Alliano.  The original complaint further alleged that their perpetrator had been apprehended and convicted prior to the City's public announcements in August and October 2013.  The operative facts of the second amended complaint relating to Ms. Doe's claim, on the other hand, alleged that she was assaulted by a different perpetrator who remained unidentified and at large at the time of the City's public announcements.

Another material difference between the complaints is the damages requested.  The second amended complaint significantly increased the damages requested from  $1.4 million, based on a single occurrence for the entire class, to $10 million, based on a separate occurrence for each claimant.  *See Osborne*, 561 S.W.2d at 164 (finding the original complaint provided fair notice of the new plaintiff's claim, in part, because "the type and extent of damage occurring and the type of recovery sought [were] clearly apparent from the complaint").

Despite the significant differences in the operative facts, the trial court concluded that the City had adequate notice of Ms. Doe's claims "because the City created the backlog of sexual assault kits and the City was the proponent of the notice to the public."  In other words, the trial court believed that an action filed by one plaintiff gives a defendant notice

of any or all similarly situated plaintiffs. We are unaware of a Tennessee case addressing this issue, but a decision from the Sixth Circuit Court of Appeals provides guidance. In *Asher v. Unarco Material Handling, Inc.*, 596 F.3d 313, 315 (6th Cir. 2010), the plaintiffs, who were former and current Wal-Mart employees, alleged injuries caused by exposure to carbon monoxide gas during a two-week period in November and December 2005. One group, the original plaintiffs, filed suit within one year from the date of the last exposure to the gas. *Asher*, 596 F.3d at 315. The other group, the new plaintiffs, was added via an amended complaint filed more than a year after the date of the last exposure to the gas. *Id.* at 316. The district court dismissed the new plaintiffs' claims as barred by the applicable one-year statute of limitations. *Id.*

On appeal, the new plaintiffs contended that, because all plaintiffs were injured by carbon monoxide in "one, unique incident that affected a single group of workers in a single area, the initial Complaint provided notice to the Defendants of the claims arising from the incident such that they prepared to defend and began defending the action from that time[,]" and adding "workers from the group similarly affected by the Defendants' conduct did not alter the defense of that conduct that the Defendants were already preparing to mount." *Id.* at 318. The Sixth Circuit rejected this argument, criticizing it as an attempt to allow "untimely plaintiffs to ride piggyback on the claims of timely plaintiffs." *Id.* As the court explained:

> [Federal Rule of Civil Procedure] 15(c) does not "permit relation back of an amendment to a pleading that names new plaintiffs after expiration of the statute of limitations when those new plaintiffs are neither substituted nor have shown mistake concerning identity[,]" even though both groups of plaintiffs "allege[d] injury by the same conduct described in the original pleading, [and] the evidence relevant to a defense against these new claims would be the same as the evidence relevant to a defense against the original claims."

*Id.* at 319 (quoting *Nelson v. Cnty. of Allegheny*, 60 F.3d 1010, 1011, 1015 (3d Cir. 1995)).

The Court found this limitation on the relation back of claims necessary to keep defendants' liability from increasing exponentially and their defensive strategy from becoming "'far more complex long after the statute of limitations had run. . . . At some point, defendants should have notice of who their adversaries are.'" *Id.* at 320 (quoting *Leachman v. Beech Aircraft Corp.*, 694 F.2d 1301, 1309 (D.C. Cir. 1982)). Applying this principle, the *Asher* court concluded that the new plaintiffs were not seeking to correct a misnomer or attempting to substitute the real party in interest, but rather, they were attempting to circumvent the statute of limitation by adding new parties and new claims. *Id.* at 319.

Similarly, in the present case, the second amended complaint did not add Ms. Doe to replace Ms. Ybos as the "real party in interest" or to "correct a pleading error." *Biscan*, 2003 WL 22955933, at *3, *4. Instead, the second amended complaint added Ms. Doe as a new plaintiff with a new claim against the City with facts differing in both time and type. *See Mayle v. Felix*, 545 U.S. 644, 650 (2005) (holding that an amended petition "does not relate back . . . when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth"). The trial court attempted to distinguish this case from *Asher* by stating that "*Asher* was not a class action." That may be true, but as discussed below, the fact that the present case involves a class action claim does not necessarily mean that Ms. Doe's claim relates back to the original complaint.

In *Barnes v. First American Title Insurance Co.*, 473 F. Supp. 2d 798, 799 (N.D. Ohio 2007), the plaintiffs filed a motion requesting permission to file a second amended complaint to substitute the original named class representatives with new, previously unnamed members of the putative class. As in the present case, the motion to file the second amended complaint was filed prior to a decision on class certification, and the plaintiffs contended that the new plaintiffs' claims related back to the original class action complaint. *Barnes*, 473 F. Supp. 2d at 800. The crux of their argument was that "substitution of class parties is common practice 'where the current named class representatives are inadequate, adequate representatives are known and available as substitutes.'" *Id.* (quoting *Little Caesar Enters. v. Smith*, 172 F.R.D. 236, 244 (E.D. Mich. 1997)). The district court disagreed, holding that the new plaintiffs' claims did not relate back because the case was distinguishable from class action cases where a class had already been certified. Notably, the court held that the claims of unnamed members of an uncertified class were not before the court:

> The Federal Rules of Civil Procedure do not support a determination that unnamed putative class members properly substituted would relate back to the original filing of the complaint. "While Rule 15(c) is framed in terms of an amendment that would change the party 'against' whom a claim is asserted and of the new party's ability to maintain a 'defense,' it is also applicable to a proposed change of plaintiffs." *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 19 (2nd Circ. 1997); *see* Advisory Committee Notes to the 1966 amendment of Fed. R. Civ. P. 15 stating "the attitude taken . . . toward change of defendants extends by analogy to amendments changing plaintiffs.". "Since the new names were added not to correct a mistake but to correct a lack of knowledge, the requirements of Rule 15(c) for relation back are not met." *Barrow v. Wethersfield Police Dep't*, 66 F.3d 466, 470 (2d Cir. 1995). Accordingly, Plaintiffs' claims do not relate back to the filing of the original complaint. Though applied to the substitution of Plaintiffs, by analogy, under the relation back provision of Rule 15(c), this case does not permit a relation back where Plaintiffs seek to amend to name new plaintiffs due to some mistake in identification. Rather, Plaintiffs seek

to amend to substitute new parties because the defenses raised by Defendants present serious concerns that named plaintiffs may not have standing to assert the claims presently before this Court. Therefore, this Court finds that the proposed new Plaintiffs' claims do not relate back to the original complaint and must be defined as new parties and new claims. See *Javier H. v. Garcia-Botello*, 239 F.R.D. 342 (W.D. N.Y. 2006.) Presumably, the proposed new plaintiffs' title insurance purchase involved different agents, at different dates and times.

In *Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644 (3d Cir. 1998), *abrogation on other grounds recognized*, *Forbes v. Eagleson*, 228 F.3d 471 (3d Cir. 2000), the Third Circuit held that prior to certification, the claims of putative class members who were not named plaintiffs were not before the Court until the class was certified. *See also Smith v. Berg*, Case No. Civ. A. 99-2133, 1999 WL 1081065, # 3, 1999 WL 1081065 (E.D. Pa. 1999.) ("The class must, however, be certified before it may become a class action. Until the putative class is certified, the action is one between the [individuals plaintiffs] and the defendants.") Therefore, this Court finds the proposed new plaintiffs are not current parties to the action prior to a ruling on certification. Therefore, the claims presented by the Hickmans in their proposed Second Amended Complaint involve claims of new parties.

*Id.* at 801-02.

The present case is also similar to *Heaphy v. State Farm Mutual Automobile Insurance Co.*, No. C05 5404RBL, 2005 WL 1950244 (W.D. Wash. Aug. 15, 2005). In that case, Denise Heaphy filed a complaint against an automobile insurer in Washington state court in August 2001, alleging that the automobile insurer failed to disclose certain rights to "a nationwide class of insureds" regarding recovery for diminution in value of vehicles involved in uninsured motorist ("UIM") accidents. *Heaphy*, 2005 WL 1950244, at *1. Ms. Heaphy asserted that she "owned her vehicle, and she purported to represent a class of similarly situated owners." *Id.* When Ms. Heaphy was forced to arbitrate her claims, the arbitrator denied the claims because Ms. Heaphy "did not actually own (but rather leased) her vehicle." *Id.* The automobile insurer sought to have the arbitration decision confirmed in state court in April 2005 but, immediately before the confirmation hearing, the plaintiffs filed an amended complaint that contained most of the allegations from the original complaint except that Ms. Heaphy purported to represent a class of insureds that leased their vehicles. *Id.* The amended complaint also sought to add Jeff Childs as a class representative for a class of insureds that owned their vehicles. *Id.* Notably, no decision had been made in the case regarding class certification at the time the amended complaint was filed. *Id.* The automobile insurer removed the case to federal court under the recently enacted Class Action Fairness Act of 2005 ("CAFA"). *Id.* The plaintiffs sought remand to state court, arguing that CAFA did not apply because, under

Wash. Sup. Ct. Civ. R. CR 15(a), the amended complaint related back to the original complaint. *Id.*

The district court denied remand after concluding that the amended complaint did not relate back to the original complaint because Mr. Childs's claims were "unique to him," making him a "'new, unrelated'" plaintiff. *Id.* at \*4, \*5. Regarding the adequate notice requirement of Rule 15, the district court held as follows:

> While [the automobile insurer] was arguably on notice from the initial complaint that Heaphy disputed its handling of UIM diminution in value losses *that complaint cannot serve as "adequate" notice of all claims on behalf of all plaintiffs who might someday fall with in the class definition*. This is particularly true where, as here, the claims of the only class representative had been fully adjudicated prior to the [amended complaint], *the new Plaintiff's claims were materially different than those of the original plaintiff*, and the [amended complaint] sought to add new substantive claims on behalf of both plaintiffs.

*Id.* at \*4 (emphasis added).

Similar to *Barnes* and *Heaphy*, the amended complaint adding Ms. Doe as a plaintiff was not filed to correct a misidentification, but rather, because discovery revealed serious concerns about the viability of the initial plaintiffs' claims due to their SAKs having been submitted for testing and their assailant having been apprehended prior to the City's public announcements. And, the operative facts of Ms. Doe's claims were materially different in both time and type than those set forth by the initial plaintiffs in the original complaint. Furthermore, the second amended complaint adding Ms. Doe's claims was filed prior to a decision on class certification, meaning her claims were not yet before the trial court. The original complaint, therefore, could not serve as "'adequate' notice of all claims on behalf of all plaintiffs who might someday fall with in [sic] the class definition." *Id.*

### (b) Cases cited by Ms. Doe are distinguishable

Before turning to the next relation back requirement, we find it necessary to address several of the cases cited by Ms. Doe to support her argument that the City had adequate notice of her claims. For the reasons discussed below, we consider those cases distinguishable from the present case.

The first case Ms. Doe relies on is *Richmond Manor Apartments, Inc. v. Certain Underwriters at Lloyd's London*, No. 09-60796-CIV-ALTONAGA/Brown, 2010 WL 11507006 (S.D. Fla. Oct. 18, 2010). She relies on this case for the proposition that the City had adequate notice of her claims because the City "knew or should have known" that she was involved in the case due to her being a putative class member and her "meeting with

counsel about the case" before being named as a plaintiff. We respectfully disagree. In *Richmond Manor*, the district court considered whether an amendment adding new named plaintiffs that had claims nearly identical to the claims of the previously named plaintiffs would relate back to the previous pleadings. *Richmond Manor*, 2010 WL 11507006, at *1, *5. Both sets of plaintiffs' claims arose from a hurricane deductible included in their insurance policies that was illegal under Florida law. *Id.* at *1-3. The defendants filed a motion to dismiss the new plaintiffs' claims as time-barred, and the court denied the motion, holding that the new claims related back to the previous pleadings. *Id.* at *3, *7.

Ms. Doe is correct that, in reaching its decision, the district court acknowledged that the amendment expanded the putative class definition from requiring that the defendants used a separate hurricane deductible to including "all insureds who have submitted claims for hurricane damage where the policy merely contains a separate deductible applicable to hurricane losses." *Id.* at *5. But, the court found that the expanded class definition was not a material change because it would not increase potential damages and because the defendants "knew or should have known how many policies contained the separate deductible provisions" and how many of them were actually used. *Id.* Therefore, the court noted, the defendants "knew or could have known" that the new plaintiffs were members of the class. *Id.*

The court explained, however, that, by making this finding, it did "not suggest that under Florida law an action filed by one plaintiff necessarily provides adequate notice of 'all claims on behalf of all plaintiffs who might someday fall with in [sic] the class definition.'" *Id.* (quoting *Heaphy*, 2005 WL 1950244, at *4). Instead, the court stated that it based its holding on the amendment's compliance with the requirements of Rule 15(c), particularly the adequate notice requirement because the new claims arose out of the same "conduct, transaction or occurrence" as the claims in the previous pleadings:

> [O]n these facts, these three early pleadings filed by [the previously named plaintiffs] provided Defendants adequate notice of the present claims because the present claims arise out of the same character of conduct and transaction described in those early pleadings. The claims are essentially the same, albeit presented by different parties under their respective, yet identical, policies issued by the Defendants.

*Id.* Stated another way: the defendant had adequate notice because the new plaintiffs' operative facts and claims were not "materially different than those of the original [named] plaintiff[s]." *See Heaphy*, 2005 WL 1950244, at *4.

The facts in the present case are not similar to those in *Richmond Manor*. As discussed above, Ms. Doe's claims in the second amended complaint are not "essentially the same" as those of the initial plaintiffs' in the original complaint. The initial plaintiffs' sexual assaults occurred after CODIS, their SAKs were submitted for DNA testing that

- 20 -

revealed they were all assaulted by the same assailant, and their assailant was arrested and convicted prior to the City's public announcements. The operative facts of Ms. Doe's claims, in contrast, describe a different character of conduct and transaction: her sexual assault occurred pre-CODIS, her SAK had not been submitted for DNA testing at the time of the City's public announcement,[6] and her assailant had not been identified and apprehended. Thus, Ms. Doe's reliance on *Richmond Manor* is misplaced.

Ms. Doe next relies on *Okeelanta v. Bygrave*, 660 So. 2d 743 (Fla. Dist. Ct. App. 1995), to support her contention that the City had adequate notice of her claims because, though there was a defect in the initial plaintiffs, that defect was personal to them and did not change the fact that the City knew from the original complaint that class-wide claims for negligent infliction of emotional distress and reckless infliction of emotional distress that was caused by the City's mishandling of approximately 12,000 SAKs. Respectfully, Ms. Doe's reliance is again misplaced.

*Okeelanta* involved a putative class action filed in August 1989 by sugar cane workers for unpaid wages. 660 So. 2d at 750. The plaintiffs sought class certification for the time period from 1983 to 1991. *Id.* at 746. Initially, the trial court denied class certification because, of the original plaintiffs, only two worked for the defendants during the relevant time period, and those two were deemed not adequate class representatives. *Id.* at 750. In July 1991, new plaintiffs were added, and the trial court certified the case as a class action with the new plaintiffs as class representatives. *Id.* The defendants contended that the new plaintiffs and their claims could not be added because the applicable statute of limitations had run. *Id.* In response, the new plaintiffs argued that their claims were not time-barred because they related back to the original complaint. *Id.*

The Florida Court of Appeals agreed with the new plaintiffs. *Id.* at 751. The court considered the determinative factor to be that the original plaintiffs' claims were the same as the new plaintiffs' claims and the class claims:

> Here, the original complaint set forth a class claim for unpaid wages, and the trial court determined that the claims were subject to treatment as a class. The court found, however, that the employee-plaintiffs who had worked for [the defendants] were so lacking in an understanding of the claims and unable to testify truthfully that they could not be adequate class representatives. Thus[,] the defect in the class representatives was not that those plaintiffs did not have a claim similar to the entire class but that attributes personal to themselves precluded their representation of the class. Consequently, this case is different from *Fleck v. Cablevision VII, Inc.*, 807 F. Supp. 824 (D.

---

[6] The original complaint contains no allegations that the City failed to submit Ms. Johnson's and Ms. Graves's SAKs for testing. It does contain an allegation that Ms. Ybos's SAK was untested as of May 2012, but her SAK was tested, her assailant was identified as Mr. Alliano, and he was convicted before the City made its public announcements in 2013.

D.C. 1992), cited by the companies as directly on point. In that case, the class certification was denied because the original plaintiffs' claims were not typical of the class they claimed to represent, and the district court denied the application of relation back under Federal Rule of Civil Procedure 15, which is more restrictive than our Florida Rule of Civil Procedure 1.190(c). Moreover, the district court did not find that the case would be most appropriately resolved as a class action. *Id.* at 826-27 n. 4.

Here, appellants knew from the filing of the original complaint that the plaintiffs were asserting a class-wide claim for unpaid wages. The trial court found that the claim was susceptible to class-wide treatment. It merely rejected individual plaintiffs as representatives of the class. . . .

*Id.*

Here, the initial plaintiffs alleged class-wide claims for negligent infliction of emotional distress and reckless infliction of emotional distress caused by the "shocking and haphazard" way the City publicly disclosed that it had not processed approximately 12,000 SAKs. They did not allege that the City failed to test their SAKs or that the City failed to prosecute their assailant because their SAKs were tested and their assailant was convicted. In stark contrast, the conduct giving rise to Ms. Doe's claims and those of the class was not the City's public announcements, but rather, the City's failure to test SAKs and to prosecute assailants.[7] Thus, the initial plaintiffs' claims were not similar to Ms. Doe's claims and were not typical of the class. As a result, unlike in *Okeelanta*, the City could not have known from the original complaint that Ms. Doe would assert a class-wide claim for negligent infliction of emotional distress and reckless infliction of emotional distress caused by its failure to process SAKs and to prosecute assailants.

Lastly, Ms. Doe relies on *Phillips v. Ford Motor Co.*, 435 F.3d 785 (7th Cir. 2006), and *In re Light Cigarettes Marketing Sales Practices Litigation*, 751 F. Supp. 2d 205 (D. Me. 2010), to contend that relation back in this case is appropriate because, contrary to the holding in *Barnes*, it is "routine" in putative class action cases prior to certification. For the reasons discussed below, her reliance on these cases is misplaced.

---

[7] In a responsive pleading to the City's motion for summary judgment, Ms. Doe's counsel stated:

It is not the way in which the City disclosed the terrible pattern of misconduct, nor the mere fact that the City did belatedly disclose the misconduct; *it is the misconduct itself, the weighty fact that thousands of SAKs were not processed (with all of the attending consequences of hindered prosecutions* and heightened fear and trauma among victims) and the gravity of that misconduct. . . . Learning that Ms. Doe's SAK had not been processed as it should have been subjected her to emotional trauma. . . . *The scandal caused an injury to the victims comprising the 12,000 women whose SAKs were not tested as they should have been.*

(Emphasis added).

- 22 -

*Phillips* involved two consolidated class actions filed against automobile manufacturers for defective paint jobs. 435 F.3d at 786. The plaintiffs in the first class action—the *Phillips* class action—initially alleged a class consisting of purchasers of Ford models from 1988 to 1997, but they amended their complaint to limit the class to purchasers of models from 1989 through 1995. *Id.* For some unidentified reason, the district judge certified a class that also included purchasers of 1996 Ford models. *Id.* The plaintiffs then amended their complaint a second time to include the 1996 purchaser class members. *Id.* This second amendment occurred after the enactment of CAFA. *Id.*

Similarly, the second class action considered by the *Phillips* court was the *Boxdorfer* class action, a case where the plaintiffs asserted claims against DaimlerChrysler Corporation, pre-CAFA. *Id.* After the enactment of CAFA, however, the plaintiffs amended their complaint to add named plaintiffs/class representatives. *Id.* The newly named plaintiffs were members of the original class that were added because there was a possibility that the original plaintiffs' claims were time-barred. *Id.* Thus, the question considered by the *Phillips* court was whether the post-CAFA amendments in both cases commenced new actions. *Id.*

Ms. Doe correctly points out that, in analyzing the issue, the court began by stating that "[s]ubstitution of unnamed class members for named plaintiffs who fall out of the case because of settlement or other reasons is a common and normally an unexceptionable ("routine") feature of class action litigation both in the federal courts and in the Illinois courts." *Id.* at 787. However, the court stopped short of holding that relation-back is "routine" or a foregone conclusion in a class action case prior to certification because the court stated as follows: "But there is a potential complication here: the plaintiff class in *Boxdorfer* has not been certified, and we do not know whether a motion for certification is pending or has been denied." *Id.* Ultimately, the court held that the amendments in both class actions related back to the previous pleadings, but the court reached that conclusion after considering the requirements for relating back under state and federal law and finding that these cases met the requirements because the amendments arose out of the same transaction or occurrence set forth in the original pleadings. *Id.* at 788. Notably, the court also explained that the amendments related back because Illinois recognized class action tolling "so that [class members] can if necessary be substituted for the named plaintiffs, without being barred by reason of the passage of time since the suit was filed." *Id.* As previously discussed, Tennessee has not adopted class action tolling and, even if it had, it would not apply here because the GTLA filing requirements must be strictly construed.

The last case Ms. Doe relies on, *Light Cigarettes*, involved a putative class action filed against cigarette manufacturers. 751 F. Supp. 2d at 207. The issue presented to the court concerned whether an amendment adding class representatives related back to the original complaint. *Id.* at 208. As in *Phillips*, the court stated that "'an amendment relates back when it arises out of "the same transaction or occurrence set up in the original pleading."'" *Id.* at 215 (quoting *Phillips*, 435 F.3d at 788 (quoting 735 ILCS 5/2-616(b))).

The court then proceeded to examine the applicable class action case law and held that an amendment related back to the original pleading if "both the original and the amended pleadings set forth exactly the same conduct by the defendant, with the only difference being the class representative." *Id.* In other words, an amendment relates back if it changes "nothing but the named plaintiffs." *Id.* That is not the case here because the second amended complaint did not merely change the named plaintiffs; it also set forth different conduct by the City.

### 2. Was the City prejudiced by the amendment?

We now consider whether the City was prejudiced by the amendment adding Ms. Doe as a named plaintiff. Inadequate notice of her claims diminished the City's opportunity to assemble evidence and construct defenses to her case, which involved facts dating back more than eighteen years and facts that were significantly different than those of the initial plaintiffs' claims. Moreover, the amendment adding Ms. Doe substantially increased the damages demand from $1.4 million, based on a single occurrence, to $10 million based on separate occurrences. *See Powell v. Bodie*, No. 3:10-0060, 2011 WL 2471536, at *7 (M.D. Tenn. 2011) (finding prejudice where new claims required defendants to engage in additional discovery and incur additional costs). Thus, the City was prejudiced by the amendment.

### 3. Was there an identity of interest?

Lastly, we consider whether there was an identity of interest between Ms. Doe and the initial plaintiffs. "'[A]n identity of interest exists when the plaintiff sought to be added is so closely identified with the original plaintiff that permitting the new party to enter will not be prejudicial to the defendant.'" *Lane*, 2013 WL 2325620, at *12 (quoting 61B AM. JUR. 2d *Pleading* § 831)). Courts consider the identity of interest element because it "ensures that the old and new plaintiffs are sufficiently related so that the new plaintiff was in effect 'involved in [the proceedings] unofficially from an early stage.'" *Leachman*, 694 F.2d at 1309 (quoting 3 J. Moore, MOORE'S FEDERAL PRACTICE 15.15[4.-1], at 15-220 (1982)). When considering this element, courts have looked for a legal or familial relationship between the original and new plaintiffs. *See Biscan*, 2003 WL 22955933, at *4 (father as next friend and father in his individual capacity for the same incident); *Osborne*, 561 S.W.2d at 164 (new plaintiff was wholly owned subsidiary of original plaintiff for the same incident).

Here, there is no familial relationship between Ms. Doe and the initial plaintiffs. Furthermore, there is no legal relationship between Ms. Doe and the initial plaintiffs because "a plaintiff who files a proposed class action cannot legally bind members of the proposed class before the class is certified," *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 593 (2013), and the class does not attain a legal status until after certification. *Cruz v. Farquharson*, 252 F.3d 530, 534 (1st Cir. 2001). It is also significant that Ms. Doe's

claims are materially different than those of the initial plaintiffs. *See Heaphy*, 2005 WL 1950244, at *4 ("Nor is there the required identity of interest between Childs and Heaphy . . . [because] Mr. Childs' claims are fundamentally different than the claims Ms. Heaphy actually pursued."). Therefore, no identity of interest existed between Ms. Doe and the initial plaintiffs.

Because the amendment failed to satisfy Rule 15's requirements, we conclude that the second amended complaint adding Ms. Doe as a plaintiff did not relate back to the previous pleadings filed by the initial plaintiffs. We, therefore, conclude that the trial court erred in denying the City's motion for summary judgment because Ms. Doe's claims were barred by the GTLA's one-year statute of limitations.

In light of our conclusion that Ms. Doe's claims were untimely, the remaining issues are pretermitted.

CONCLUSION

The judgment of the trial court is reversed, and the matter is remanded to the trial court for entry of an order granting summary judgment to the City and dismissing Ms. Doe's claims against the City. Costs of this appeal are assessed against the appellee, Janet Doe, for which execution may issue if necessary.


/s/ Andy D. Bennett          
ANDY D. BENNETT, JUDGE